[No. A067045. First Dist., Div. Two. May 21, 1996.]

In re the Marriage of DANIEL and CONNIE BRAUD.
DANIEL BRAUD, Appellant, v.
CONNIE BRAUD, Respondent.

## COUNSEL

Mathews & Kluck and Francis B. Mathews for and Appellant.

Dalton & Bicknell, Donald W. Bicknell and Michael S. Gillaspie for Respondent.

## OPINION

PHELAN, J.*—In these cross-appeals, Daniel Braud and his ex-wife, Connie Braud,[1] seek review of an "Order on Reserved Issues," which was entered after trial in this marital dissolution action on June 23, 1994. By that order, the trial court ruled that: (1) Notwithstanding Daniel's substantial separate property investment in the family home, sale would be deferred until the parties' youngest child reaches the age of 18, pursuant to Family Code section 3800 et seq.;[2] (2) At the time of sale, Daniel would be reimbursed (without interest) for a $34,396 lump-sum payment on the parties' mortgage plus $10,000 for improvements to the family home, both of which he claimed to have paid out of funds he inherited from his grandmother; (3) Daniel was entitled to keep $20,734 out of a $25,000 withdrawal he made in September 1991 from a joint account which contained both separate property and community property funds; (4) Daniel was to receive an offset against his monthly child support obligations in an amount equal to one-half the net fair rental value of the family home; and (5) Connie was to receive an award of attorney fees, but the amount would be limited to $500.

---

*Presiding Justice, Court of Appeal, First District, Division Three, sitting under assignment by the Chairperson of the Judicial Council.

[1]For the sake of clarity and convenience in these cross-appeals between parties with the same last name, we will refer to the parties as Daniel and Connie.

[2]Although the bulk of the proceedings in the trial court were conducted under the Civil Code, former section 4800 et seq.; most of the relevant Civil Code sections were repealed and reenacted in Family Code section 3800 et seq. without substantive change, effective January 1, 1994. (See Stats. 1992, ch. 162, § 10.) For convenience, all statutory references are to the current sections of the Family Code unless otherwise indicated.

We conclude that the trial court had jurisdiction to enter the deferred sale of home order in this case, and did not abuse its discretion in fashioning the deferred sale order and the net fair rental value offset for Daniel's support obligations. We further conclude that substantial evidence supports the trial court's confirmation of Daniel's $20,734 separate property interest in the funds withdrawn in September 1991. Accordingly, we will affirm those aspects of the trial court's order of June 23, 1994.

As to the separate property interest attributable to Daniel's lump-sum payoff of the parties' mortgage in March 1991, however, we conclude that the trial court erred when it refused to consider Daniel's argument that, rather than a fixed sum of $34,396, he should recover a percentage of the proceeds from the deferred sale. Furthermore, as to the $10,000 Daniel claimed for improvements to the family home, we conclude that there was insufficient evidence presented at trial to trace those improvements to a separate property source. Finally, we conclude that the trial court abused its discretion by awarding Connie less than 10 percent of the attorney fees she incurred in the trial court proceedings, without any explanation of the reasons or other apparent basis in the record for such a sharp reduction of this need-based award. In these respects, we will reverse the trial court's June 23, 1994 order, and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties were married in 1976 and separated in October 1991 after 15½ years of marriage. They had three children, who were fourteen, ten, and five years of age at the time of trial in June 1993.[3] In 1985, the parties purchased and moved into the family home on Chestnut Street in Eureka when the two older children were, respectively, six and two years old. The parties borrowed $10,000 from Connie's parents to be applied as a down payment on the total purchase price of $52,000, and the seller (a relative of Connie's) accepted a note for the balance. Daniel later applied $34,396 from his inheritance to pay off this loan.[4]

The family home is adjacent to Lafayette Elementary School where, at the time of trial, the parties' middle child had just completed fifth grade and the

---

[3]A judgment of dissolution of the marriage was entered on May 6, 1993, but the trial court reserved jurisdiction over all financial, property, custody, and support issues by order dated April 23, 1993. In open court on June 7, 1993, the parties advised the court that they had reached an agreement on all custody and visitation issues.

[4]Daniel received an inheritance of $65,129.76 in March 1991. After paying off the principal balance of the note on the family home, Daniel deposited the remaining funds—approximately $31,000—in his separate Dean Witter account. On April 17 and May 17, 1991, Daniel made two withdrawals of $5,000 each from this separate account to pay for improvements to the family home. Connie deposited that $10,000 in the couple's joint account at Provident

youngest child had just completed kindergarten. At the time of entry of the judgment below, the family home was found to have a fair market value of $125,000.

During the marriage, Daniel worked as a long-haul trucker earning approximately $3,000 per month. At the time of trial, Daniel was earning substantial overtime pay, but had not filed current income/expense declarations. His most recent financial statements were from December 1992, which included paystubs that were 10 to 12 months old at the time. He had substantial separate property at the time of separation, including: a dune buggy, a jet ski boat and trailer, classic automobiles, $13,000 of liquid assets (including $6,000 in currency), and an interest in an oil well.[5] Daniel also had a future interest in one-third of a piece of real estate valued between $200,000 and $300,000, and lived rent-free on that property.

Connie was a full-time homemaker and had no earned income at the time of trial. She had no significant work history outside the home during the marriage, and no success finding employment after the couple's separation. Connie is a high school graduate and attended community college for one year, but did not receive any degree or certificate from that college. She has no special job training except a bus driving course she took after separation. At the time of trial, Connie was receiving a total of $900 per month in temporary child and spousal support. She had no other money with which to pay attorney fees. She had no liquid assets, except a couple of hundred dollars in the bank.

The trial of this matter commenced on June 7, 1993. The matter was argued and submitted upon the receipt of posttrial briefs on June 17, 1993. On January 18, 1994, after a series of posttrial motions, the trial court filed an order awarding Connie child support in the amount of $1,244 per month[6] but, at Connie's request, no spousal support. The trial court retained jurisdiction over the issue of spousal support. Also on January 18, 1994, the trial court awarded Connie $500 for attorney fees, plus her actual costs, for the motion to modify spousal support.

After further posttrial proceedings regarding Connie's request for a deferred sale of the family home, the trial court issued an "Order on Reserved

Credit Union. The Dean Witter account was converted to a joint account in or about June 1991. On September 9, 1991, however, Daniel withdrew $25,000 and placed that sum with his sister.

[5]The parties stipulated to an equal division of personal property on March 27, 1993. No issue regarding that stipulation is presented in these appeals.

[6]This amount was determined by application of the California Child Support Guideline (Cal. Rules of Court, rule 1274, repealed effective Jan. 1, 1994; see now § 4050 et seq. [Statewide Uniform Guideline]), based on the trial court's findings that Daniel and Connie had net monthly incomes, respectively, of $2,765 and $76.

Issues" on June 23, 1994. By that order, which was explained in greater detail in a subsequently filed statement of decision,[7] the trial court specifically found that it was in the best interests of the children to defer sale of the family home until the youngest child turned 18, or until further order of the court. The court also determined that it was economically feasible for Connie to remain in the family residence with the children, since there was no outstanding mortgage balance and she did not have the financial ability to obtain other suitable housing for herself and the children. The court also found that Daniel was able to live rent-free in a small house on a piece of property in which his father had a life interest. Alternatively, the trial court found that Daniel had adequate income from his job and separate property resources with which he would be able to obtain housing for himself and his children when they come to visit. Based on these findings, the court ordered that sale of the family home would be deferred until the parties' youngest child turned 18, or until further order of the court. The court retained jurisdiction over the property pursuant to section 3809.

Over Connie's objection, the trial court further determined that the family home had a fair rental value of $700 per month and allowed Daniel an offset of 50 percent of the "net fair rental value" (the fair rental value, less amounts to be paid by Connie for insurance, taxes and maintenance) against his monthly support obligations.[8] The court also awarded Daniel a separate property interest in the family home of $44,396, which would be reimbursable to him upon sale, without interest, before division of the net sale proceeds between the parties.[9] Connie has at all times conceded that Daniel has a separate property interest for the lump-sum amount he paid on the mortgage. However, she objected to the trial court's award to Daniel of an additional $10,000 separate property interest for improvements made to the house, and a separate property interest in $25,000 that Daniel removed from the parties' joint bank account shortly before they separated.[10] Finally, the trial court awarded Connie "an additional $500.00 attorney's fees and actual costs . . . ."

---

[7]At the end of the June 7, 1993, hearing, Mr. Bicknell requested a statement of decision. That was not finally accomplished until after Daniel filed his notice of appeal from the June 23, 1994 "Order on Reserved Issues." The statement of decision was filed on September 19, 1994, but entered nunc pro tunc, as of June 22, 1994.

[8]Specifically, the trial court found the "net fair rental value" to be $498 per month, after deducting amounts for taxes ($82 per month) and insurance ($120 per month) from the "fair rental value" of $700 per month. Thus, the court's order left Connie with net child support of $995 per month ($1244-$249 = $995).

[9]The court also found that Connie's parents would be entitled to reimbursement of the $10,000 they loaned for the down payment on the Chestnut Street house, without interest. The court characterized the parents' interest by saying that it "constitute[s] a mortgage or deed of trust upon said premises and is a security interest only."

[10]Actually, the trial court awarded Daniel a separate property interest in $20,734.25 of the $25,000 withdrawal, with the balance ($4,265.75) characterized as community property.

On August 29, 1994, Daniel filed a notice of appeal "from the 'Order on Reserved Issues' entered June 23, 1994." On September 14, 1994, Connie timely filed a cross-appeal from "the Judgment entered in the above-entitled matter on June 23, 1994."

## II. DANIEL'S APPEAL

In the main appeal, Daniel challenges those portions of the trial court's order by which it deferred sale of the family home for up to 12 years, and ruled that his separate property interest in the home would be reimbursed upon sale without interest. Daniel contends that the trial court was without jurisdiction to order a deferred sale of the family home in this case—i.e., a "mixed asset" in which he, as the spouse out of possession (the "nonresident parent" or the "out-spouse"), has a separate property interest. Daniel further contends that Connie's living arrangements with her "carpenter boyfriend," Keith Combs, constitutes a "remarriage" or "change in circumstances" within the meaning of section 3808, creating a rebuttable presumption that deferral of the sale was and is improper. Assuming we find the deferred sale order to be proper, Daniel further contends that the trial court erred in calculating both his interest in the proceeds of the future sale of the family home, and the offset against his current child support obligations for the portion of the net fair rental value attributable to his share of the house.[11] We will discuss each of these issues in turn.

A. *The Trial Court Had Jurisdiction to Issue a Deferred Sale of Home Order in This Case.*

Under a statutory scheme adopted in 1988, family law courts are authorized to issue an order deferring sale of the family home if the court determines that it is "economically feasible" to maintain the physical condition of the home and required house payments during the deferral period, and that "the order is necessary in order to minimize the adverse impact of dissolution of marriage or legal separation of the parties on the child."

Daniel was then ordered to pay half of the balance ($2,132.87) to Connie forthwith. Because the parties debate the issue in terms of a $25,000 separate property interest, however, we will use that number for ease of reference in our discussion.

[11] We decline to reach the issue of the propriety of trial court's January 18, 1995, order awarding Connie her attorney fees for this appeal, which order does not even appear in the record on appeal. Moreover, Daniel's notice of appeal did not reference that order and no further appeal was taken from the fee award, which is a special, separately appealable order after final judgment. (*Fulton* v. *Fulton* (1934) 220 Cal. 726, 729 [32 P.2d 634].) The time for appeal from the January 18, 1995, order has long since run and that order has, accordingly, become final. We also decline to entertain any claim of error in the computation of child support which is based on financial information contained in Connie's application for appellate attorney fees. No such information is included in the record on appeal.

(§ 3802, subd. (a); see also Civ. Code, former § 4700.10, subds. (b), (c), added by Stats. 1988, ch. 729, § 1, p. 2424.) Such an order "temporarily delays the sale and awards the temporary exclusive use and possession of the family home to a custodial parent of a minor child or child for whom support is authorized . . . , whether or not the custodial parent has sole or joint custody, in order to minimize the adverse impact of dissolution of marriage or legal separation of the parties on the welfare of the child." (§ 3800, subd. (b); see also Civ. Code, former § 4700.10, subd. (a)(2).) The statutory scheme nowhere defines the term "family home."

▮ Daniel's principal argument against the deferred sale order in this case is that the trial court lacks jurisdiction to issue such an order where the out-spouse has a separate property interest in the home.[12] In concluding that it had jurisdiction to enter a deferred sale of home order in this case, the trial court relied on *In re Marriage of Horowitz* (1984) 159 Cal.App.3d 368 [205 Cal.Rptr. 874] (*Horowitz*), a case involving a deferred sale order as to a family home in which the resident spouse (the "in-spouse") had a substantial separate property interest. (*Id.* at p. 371.) *Horowitz* is of dubious value as precedent for the trial court's conclusion. Even assuming that *Horowitz* stands for the proposition that a deferred sale order is authorized where the in-spouse has a separate property interest in the family home,[13] such a situation is not fairly comparable to the instant case. ▮ An in-spouse who prevails on a request for a deferred sale order actually enjoys the possession and use of his or her separate property interest in the home during the deferral period, and by requesting or acceding to the deferral order, can be deemed to have waived his or her objections to any express or implied restrictions on sale of the separate property interest. By contrast, an out-spouse such as Daniel, who has not requested and has objected to entry of a deferred sale of home order, loses dominion and control over his separate property interest under compulsion of the court's order. Thus, we must consider as a matter of first impression whether the family court has jurisdiction to enter a deferred sale order as to a family home in which an out-spouse has a separate property interest.

---

[12]Daniel does not specify in what sense "jurisdiction" was lacking. We have no doubt that the trial court had personal jurisdiction over him when the deferred sale of home order was entered. (Code Civ. Proc., § 410.50; and see *In re Marriage of Smith* (1982) 135 Cal.App.3d 543, 551 [185 Cal.Rptr. 411].) As a general matter, the court also had "jurisdiction to inquire into and render any judgment and make orders that are appropriate concerning . . . [¶] (e) The settlement of the property rights of the parties." (§ 2010.)

[13]Of course, *Horowitz* reversed the deferral order in that case, holding that delaying the sale beyond the time the youngest child of the parties reached the age of 18 was error. (159 Cal.App.3d at pp. 371-372.) The court further held that it was error to award the out-spouse his *community property* interest in the family home in a fixed monetary amount, without interest or appreciation, because the award resulted in an unequal division of the community property. (*Id.* at p. 372.) Other than a passing mention, there was no discussion of the fact that the in-spouse had a separate property interest in the home.

Daniel contends that the trial court's order runs afoul of fundamental principles about family court jurisdiction over the spouses' separate property in a dissolution action. ▮ Indeed, it is well settled in California that the court's jurisdiction over the parties' separate property is quite limited. One highly regarded family law treatise states the traditional rule as follows: "The court may *characterize* disputed assets and liabilities as being separate or community, may *confirm* separate property to the owner spouse and, to the extent permitted by statute, may order *reimbursement* from the community to a party's separate estate or to the community from a party's separate estate. . . . But unless the parties otherwise agree, the court's jurisdiction over *separate property* extends no further . . . ." (2 Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1996) ¶ 8:903, p. 8-213, italics in original (hereinafter Hogoboom & King); *In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1275 [255 Cal.Rptr. 488], citing *In re Marriage of Buford* (1984) 155 Cal.App.3d 74, 78 [202 Cal.Rptr. 20]; *In re Marriage of McNeill* (1984) 160 Cal.App.3d 548, 565-566 [206 Cal.Rptr. 641]; see also *Porter* v. *Superior Court* (1977) 73 Cal.App.3d 793, 805 [141 Cal.Rptr. 59] [as a general rule the superior court in a divorce proceeding has no jurisdiction to deal with the separate property of the spouses, but the superior court in which the action for divorce must be brought is also invested with general jurisdiction to determine title to real property and, thus, if the parties in a divorce proceeding see fit to make the character of property held by them an issue in the proceeding, the same effect must be given to its judgment as if a direct superior court action had in fact been brought]; *Robinson* v. *Robinson* (1944) 65 Cal.App.2d 118, 119 [150 P.2d 7] [trial court in divorce action has no jurisdiction to dispose of the spouses' separate property, or to carve out a life estate therein].)

Of course, this general rule is not without its exceptions. In the proceedings below, Connie relied on section 2650, a statutory exception which authorizes the family law court at the request of either party to divide the spouses' separate property interests in real and personal property held between them as joint tenants or tenants in common. Connie argued that section 2650 is a generalized grant of jurisdiction to the family law courts to divide or otherwise dispose of the spouses' separate property. She renews this argument on appeal, but cites no authority to support it. We dare say that no such authority exists, because section 2650 (Civ. Code, former § 4800.4) was intended to close a historical loophole, pursuant to which separate property interests—even those held in joint title between spouses—could only be partitioned in a separate civil action. (See *In re Marriage of Gagne* (1990) 225 Cal.App.3d 277, 281-285 [274 Cal.Rptr. 750]; *In re Marriage of Leversee* (1984) 156 Cal.App.3d 891, 897-898 [203 Cal.Rptr. 481]; 2 Hogoboom & King, *supra*, ¶ 8:905, p. 8-214.) In that respect, section 2650 is

simply a streamlining measure, one which is consonant with the general rules that the family law court has jurisdiction to settle "the property rights of the parties" (§ 2010), and that the court has jurisdiction to settle matters voluntarily submitted to it by the parties (see, e.g., *In re Marriage of Saslow* (1985) 40 Cal.3d 848, 865-866 [221 Cal.Rptr. 546, 710 P.2d 346]; *Spahn v. Spahn* (1945) 70 Cal.App.2d 791, 795-796 [162 P.2d 53]). Moreover, section 2650 does not apply to the instant case because it is Daniel's *individual* separate property that is in dispute.

There are, however, other statutory sources of jurisdiction on which the trial court might have relied. Most obvious, of course, is the deferred sale of home order statute itself, section 3800 et seq. By employing the unambiguous term "family home" without qualifying that concept in anyway (see § 3800, subd. (b)), and by focusing on the welfare of the children and "economic feasibility" as the only prerequisites to issuance of a deferred sale order, the Legislature appears to have overridden, at least in part, the traditional limitations on family court jurisdiction over separate property.

Whether section 3800 et seq. constitutes a grant of jurisdiction over an out-spouse's separate property is a matter of statutory interpretation. It is well settled that in interpreting statutes, we must "determine and effectuate legislative intent." (*Woods v. Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455].) "To ascertain intent, we look first to the words of the statutes" (*ibid.*), "giving them their usual and ordinary meaning." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 8 [255 Cal.Rptr. 412, 767 P.2d 679].) "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]" (*Hartford Fire Ins. Co. v. Macri* (1992) 4 Cal.4th 318, 326 [14 Cal.Rptr.2d 813, 842 P.2d 112].) The plain meaning of the term "family home" supports Connie's position that the Legislature authorized the trial courts to enter a deferred sale order as to any home that was the family's principal residence before dissolution, regardless of the characterization of the ownership interests as separate or community property of the spouses. The Legislature could hardly have chosen words with a clearer meaning than "family home."[14] The stated purpose to "minimize the adverse impact of dissolution of marriage . . . on the welfare of the child" also militates in

---

[14]In any event, the legislative history of section 3800 et seq. sheds little light on the jurisdictional issue presented in this appeal. The original version of the statute (Civ. Code, former § 4800.7) was obviously designed to codify the rule of *In re Marriage of Duke* (1980) 101 Cal.App.3d 152 [161 Cal.Rptr. 444], but also to make it clear that the trial court has the

favor jurisdiction to enter a deferred sale order as to *any* "family home," regardless of the parties' respective ownership interests. (§§ 3800, subd. (b); 3802, subd. (a).)

Our conclusion that section 3800 et seq. authorizes a deferred sale order as to a family home in which the out-spouse has a separate property interest is consonant with other statutory provisions that confer jurisdiction on the family law courts to act in various ways that invade and impair the separate property rights of ex-spouses, e.g., when making support orders (see § 4008 (Civ. Code, former § 4807) [child support orders may be enforced against separate property to the extent the court deems it "just"]; § 4338 (Civ. Code, former § 4805) [spousal support orders may be enforced against separate property after community property and quasi-community property are exhausted]), and attorney fee awards (§ 2032, subds. (c), (d) (Civ. Code, former § 4370.5) [payment of attorney fees award may be ordered from any type of property, whether community or separate, principal or income]). For our purposes, the most significant of these statutory grants of jurisdiction is

authority to modify or terminate a "family home award" when the in-spouse "remarries or there is otherwise a change in circumstances affecting the economic status of the parties." (See Legis. Counsel's Dig., Assem. Bill No. 2739 (1983-1984 Reg. Sess.) p. 1; Sen. Republican Caucus, Analysis of Assem. Bill No. 2739 (1983-1984 Reg. Sess.) pp. 1-2.) In this respect, Civil Code former section 4800.7 was intended to overrule certain cases (see, e.g., *In re Marriage of Johnson* (1982) 134 Cal.App.3d 148, 160 [184 Cal.Rptr. 444]; *In re Marriage of Escamilla* (1982) 127 Cal.App.3d 963, 970 [179 Cal.Rptr. 842]) that limited the discretion of the trial courts to modify or terminate a *Duke* award when the custodial spouse remarries, or cohabits with a person of the opposite sex "to the extent that the cohabitation changes the parties' economic circumstances." (Sen. Republican Caucus, Analysis of Assem. Bill No. 2739 (1983-1984 Reg. Sess.) p. 1.)

In 1988, the Legislature repealed Civil Code, former section 4800.7, and reenacted it as Civil Code, former section 4700.10, which was a much more comprehensive treatment of the subject. (Stats. 1988, ch. 729, § 1, p. 2424.) Apparently, by enumerating the factors a trial court might properly consider when deciding whether to grant or deny a deferred sale of home order, the authors hoped to counteract an upward trend in forced home sales in divorce cases, and to "encourage adequate attention to the needs of minor children who may be involved in the divorce," while still maintaining a balance between the children's needs and the "need of the potential nonresident parent for the equity in the home." (Letter to Governor George Deukmejian from Sen. Gary K. Hart, Aug. 22, 1988, pp. 1-2.) There are some references in the legislative history which seem to indicate that deferred sale orders were contemplated only as to community property family homes. For example, in his letter to the Governor, Senator Hart stated that "current law *relating to community property* permits the courts to defer the sale of the family home [citation]; defines the purpose of a deferred sale as being 'to minimize the adverse impact of dissolution or legal separation on the welfare of the children'; states the court's ability to modify or terminate the deferral [citation]; and states the circumstances under which deferrals should be terminated [citation]. However, it does not provide guidance to the courts as to when a deferral might be in order." (Hart letter, pp. 1-2.) On the other hand, it is reasonably clear from the rest of the available history that the Legislature never actively considered the possibility that the statute might be applied to mixed assets.

section 4008, which provides: "The community property, the quasi-community property and the separate property may be subjected to support of the children in the proportions the court determines are just." A section 3800 deferred sale of home order is, after all, a form of child support. (1 Hogoboom & King, *supra*, ¶ 6:540, p. 6-148.4.) Thus, when read together, sections 3800 et seq. and 4008 can be viewed as authorizing deferred sale of home orders that impinge upon separate property interests of out-spouses who are also child-support obligors, at least where the trial court determines that the deferral order is "economically feasible" and "necessary in order to minimize the adverse impact of dissolution of marriage or legal separation of the parties on the child" (§ 3802, subd. (a)), and that subjecting the separate property interest of the out-spouse to the deferral order would be "just" (§ 4008).

▆▆▆ In this case, Daniel is unquestionably a child support obligor, and the Chestnut Street house undoubtedly qualifies as the "family home." Therefore, assuming that the evidence in this case was sufficient to support the trial court's findings about economic feasibility and the welfare of the children, the trial court had jurisdiction under section 3800 et seq. and section 4008, to enter a deferred sale order as to the family home in this case, notwithstanding the fact that the Chestnut Street house is a "mixed asset" in which Daniel has a substantial separate property interest.[15]

---

[15]By so concluding, we do not mean to say that the out-spouse's separate property interest in the family home is irrelevant to the trial court's decision whether to enter a deferred sale order. Under section 3800 et seq., the existence of such a separate property interest may come into play as the trial court considers the factors the Legislature has established as guidelines for the exercise of its discretion to grant or deny a deferred sale order. (See, e.g., § 3802, subd. (b)(7) [financial ability of each parent to obtain suitable housing; *id.*, subd. (b)(9) [economic detriment to the nonresident parent in the event of a deferred sale of home order]; *id.*, subd. (b)(10) [any other factors the court deems just and equitable].)

We also recognize that, taken to its logical conclusion, our interpretation of section 3800 et seq. would permit the trial court to enter a deferred sale order as to a "family home" that is entirely the out-spouse's separate property and, at least in theory, deprive the out-spouse of the use and enjoyment of that property for a very long period of time. Indeed, Connie's counsel informed the trial court he had been involved in another case in Humboldt county in which a different trial judge had issued a deferred sale of order as to a home that was entirely the separate property of the out-spouse. Although Mr. Bicknell did not mention the term of that order, it is conceivable that a deferred sale of home order could be imposed for up 18 years to accommodate an in-spouse with a newborn child, for instance, where there are other children of the marriage with strong ties to the family home and surrounding environs. Under section 3800 et seq., however, the duration of the deferred sale of home order must be specified (§ 3803), there must be substantial evidence that the order is "economically feasible" and "necessary" to the welfare of the children (§ 3802, subd. (a)), and the trial court must consider and weigh all the evidence presented on these and other statutory factors (§ 3802, subd. (b)), before exercising its discretion to enter such a long-term order. (See also *In re Marriage of Stallworth* (1987) 192 Cal.App.3d 742, 746-750 [237 Cal.Rptr. 829].)

B. *The Trial Court Did Not Abuse Its Discretion by Deferring Sale of the Family Home in This Case.*

██ Having determined that the trial court had the requisite jurisdiction, we turn next to Daniel's contention that the trial court abused its discretion by issuing a deferred sale of home order in the circumstances of this case. We disagree.

In determining whether it is "economically feasible" to maintain the house payments and the condition of the home, the trial court must consider: (1) the resident parent's income; (2) the availability of spousal and child support; and (3) any other sources of funds to make the house payments. (§ 3801, subd. (b); Civ. Code, former § 4700.10, subd. (b).) The legislative intent behind the economic feasibility determination is to avoid default on the payments of house-related debts and resulting foreclosures, to avoid inadequate insurance coverage, to prevent deterioration of the condition of the family home, and to prevent any other loss of the parents' equity in the home. (§ 3801, subd. (c); Civ. Code, former § 4700.10, subd. (b).)

The record of this case amply supports the trial court's finding that a deferred sale of home order was "economically feasible." There is no real dispute that Connie's earning potential, at least at the time of trial and for the near-term future, is minimal.[16] Nevertheless, given that the house is completely unencumbered, there is also no real dispute that Connie will be able to manage the modest monthly payments for taxes, insurance and maintenance, using some combination of child support payments and earnings. There is, thus, no appreciable risk of default, foreclosure, inadequate insurance coverage, deterioration, or any other loss of Daniel's equity in the home.

Of course, a deferred sale of home order is never mandatory; so long as the threshold statutory requirement of economic feasibility is met, the trial court has broad discretion to grant or deny a request for such an order. (§ 3802, subd. (a); *In re Marriage of Stallworth, supra,* 192 Cal.App.3d at p. 748; *Horowitz, supra,* 159 Cal.App.3d at p. 374, fn. 6; see also *In re Marriage of Duke, supra,* 101 Cal.App.3d at p. 160; *In re Marriage of Herrmann* (1978) 84 Cal.App.3d 361, 366-367 [148 Cal.Rptr. 550]; *In re Marriage of Boseman* (1973) 31 Cal.App.3d 372, 374-376 [107 Cal.Rptr. 232].) In exercising its discretion to grant or deny a deferred sale of home order, however, the trial court is required to weigh and consider all available

---

[16]Daniel's only contention on this point is an unsubstantiated claim that Connie's "carpenter boyfriend" is providing her with means of support. We will address that argument more fully below.

evidence bearing on the following: "(1) The length of time the child has resided in the home. (2) The child's placement or grade in school. (3) The accessibility and convenience of the home to the child's school and other services or facilities used by and available to the child, including child care. (4) Whether the home has been adapted or modified to accommodate any physical disabilities of a child or a resident parent in a manner that a change in residence may adversely affect the ability of the resident parent to meet the needs of the child. (5) The emotional detriment to the child associated with a change in residence. (6) The extent to which the location of the home permits the resident parent to continue employment. (7) The financial ability of each parent to obtain suitable housing. (8) The tax consequences to the parents. (9) The economic detriment to the nonresident parent in the event of a deferred sale of home order. (10) Any other factors the court deems just and equitable." (§ 3802, subd. (b).)

It is clear from the record of this case that the trial court carefully considered and weighed the evidence presented with respect to the foregoing factors. The court noted that the oldest child had lived in the Chestnut Street house for nine years and that it was the only home the two younger children had ever known. This long, stable period of residence was undoubtedly the basis for the trial court's further finding that the children would suffer emotional detriment if forced to move from the family home. (See *In re Marriage of Duke, supra,* 101 Cal.App.3d at p. 156 ["The longer the occupancy, . . . the more . . . traumatic and disruptive a move to a new environment is to children whose roots have become firmly entwined in the school and social milieu of their neighborhood."].) The trial court also found that one or both of the two younger children, who were ten and five years of age at the time of trial, would likely continue attending their neighborhood schools for at least six more years.

The court also considered evidence indicating that Connie had no present ability to obtain suitable housing for herself without a deferred sale order, and that Daniel was able to live rent-free in a small house on a piece of property in which his father had a life interest. Alternatively, the trial court found that Daniel had adequate income from his job and separate property resources with which he would be able to obtain housing for himself and his children when they come to visit. Finally, the court obviously considered the economic detriment Daniel would suffer from the deferred sale of home order, and partially ameliorated that problem by awarding him an offset for the loss of use of his separate and community property interests in the

house.[17] On this record, we readily conclude that the deferred sale of home order was within the discretion of the trial court.[18]

Daniel contends, however, that Connie's living arrangement with Keith Combs constitutes a "remarriage" or a "change in circumstances" within the meaning of section 3808,[19] creating a rebuttable presumption that any deferral of the sale of the family home in this case is improper. Daniel's argument on this point is both factually and legally unsound. There is no proof that Connie has remarried, and Daniel's testimony about his ex-wife's living arrangements was hotly disputed. Connie and Mr. Combs admitted that they had an ongoing relationship and that he was spending a lot of time at her house, including overnights when his own children were not staying with him. However, Mr. Combs maintained his own home, stayed at his own home at least half the time, and paid all the expenses associated with that home. He also testified that he was not contributing cash to Connie's household, but did help out by repairing her car and doing minor repairs and maintenance around her house. Although the trial court did not specifically address the issue, it would have been justified in concluding from this evidence that Connie's and Mr. Combs's relationship was not, as Daniel appears to argue, the functional equivalent of a "remarriage." Most importantly, the trial court reasonably could have found, based on the parties' conflicting testimony, that Mr. Combs was not providing Connie with a significant level of support.

Even if Connie and Mr. Combs were cohabiting on a full-time basis, however, that fact, by itself, would not be sufficient to warrant denial of the

[17]The trial court also raised the issue of possible adverse tax consequences from the deferred sale order, but found that Daniel had not presented any evidence on this point.

[18]Theoretically, the trial court might have conditioned the deferred sale of home order on the parties' obtaining a loan with which Daniel could have cashed out his separate property interest. Daniel argued for just such an arrangement in the posttrial proceedings. Depending on how that financing was structured, the court could then have reconfigured the title to conform to any new ownership and security arrangements. But the court would also have been required to revisit the issue of "economic feasibility," and its child and spousal support orders, to take into account the new mortgage payment. We cannot say that such an approach would have been any better than the one taken by the trial court in this case. Of course, there would seem to be nothing, other than ill will, to prevent the parties from agreeing now or in the future to refinance the house to free up some cash for Daniel's use. (See 1 Hogoboom & King, *supra*, ¶ 6:547, p. 6-150 [parties free to set terms and conditions for a deferred sale of home order by agreement].)

[19]In relevant part, section 3808 provides: "[I]f the party awarded the deferred sale of home order remarries, or if there is otherwise a change in circumstances affecting the determinations made pursuant to Section 3801 or 3802 or affecting the economic status of the parties or the children on which the award is based, a rebuttable presumption, affecting the burden of proof, is created that further deferral of the sale is no longer an equitable method of minimizing the adverse impact of the dissolution of marriage or legal separation of the parties on the children."

request for a deferred sale of home order. In this regard, we note that the Legislature is well aware of the issue of remarriage and nonmarital cohabitation by ex-spouses who are the beneficiaries of support orders in family law proceedings, and knows how to provide for those contingencies expressly when it elects to do so. (See § 4323, subd. (a) [supported spouse's cohabitation with nonmarital partner gives rise to presumption of decreased need for support]; cf. § 4057.5, subd. (a)(1), (2), eff. Jan. 1, 1994 [income of both supported and supporting spouse's subsequent spouse or nonmarital partner "shall not be considered when determining or modifying child support, except in an extraordinary case where excluding the income would lead to extreme and severe hardship to any child subject to the child support award . . . ."].) Indeed, as we have already discussed, the issues of remarriage and cohabitation by the in-spouse were central to the Legislature's decision to codify the concept of a "deferred sale of home order" in the first place, and to vest the trial courts with considerable discretion to modify or terminate those orders when there are significant changes in the parties' postdissolution circumstances. (See Legis. Counsel's Dig., Assem. Bill No. 2739 (1983-1984 Reg. Sess.) p. 1; Sen. Republican Caucus, Analysis of Assem. Bill No. 2739 (1983-1984 Reg. Sess.) pp. 1-2.) However, in the original version of the "family home award" legislation (Civ. Code, former § 4800.7), and in every amendment and recodification since 1984, the Legislature obviously decided that cohabitation, by itself, was not sufficient to trigger a statutory presumption against further deferral. (§ 3808; Civ. Code, former § 4700.10, subd. (e)(2).) It is only where the cohabitation constitutes "a change in circumstances affecting the determinations made pursuant to Section 3801 or 3802 or affecting the economic circumstances of the parties or the children on which the award is based" that the trial court should reconsider its deferred sale of home order under the burden-shifting presumption of section 3808.

In the trial court, Daniel argued that Connie's living arrangement with Mr. Combs constituted just such a "change in circumstances," and now contends that the trial court erred by not applying the statutory presumption of section 3808 in its determination of Connie's request for a deferred sale of home order. Although the trial court never directly addressed this issue, we assume it rejected Daniel's argument when it granted Connie's request for a deferred sale of home order and reaffirmed that order in the face of Daniel's posttrial challenges. After a careful review of the record, we conclude that the trial court did not err in this regard. As we have discussed Connie admitted living with Mr. Combs on at least a part-time basis, but the evidence was disputed about the extent of support, if any, she was receiving from him. Presumably, the trial court accepted Connie's and Mr. Combs's testimony that any such support was minimal, given that he continued to maintain a separate household for himself and his children. On this evidence, it was plainly reasonable

to conclude that Connie's relationship with Mr. Combs did not affect either "the determinations made pursuant to Section 3801 or 3802," or "the economic circumstances of the parties or the children" so as to warrant a presumption against a deferred sale order or denial of same.

### C. *The Trial Court Did Not Abuse Its Discretion by Awarding Daniel 50 Percent of the Net Fair Rental Value as an Offset Against His Support Obligations.*

■ Daniel next contends that, if the deferred sale of home order is upheld in this case, the trial court further erred by awarding him only 50 percent of the net fair rental value as an offset against his support obligations. We reject this argument.

Section 4057, subdivision (b)(2), expressly permits a downward departure from the presumptively correct amount of child support (as determined under the statewide uniform child support guideline [§ 4050 et seq.]) where a section 3800 deferred sale of home order has been entered. That is, the formula amount of child support may be adjusted downward to the extent the rental value attributable to the out-spouse's ownership interest exceeds the mortgage payments, homeowner's insurance, and property taxes. It was just this type of adjustment of the child support order that Justice King proposed in *Horowitz, supra*: "If [a deferred sale of home order] is made, the in-spouse should be given the right to sole use and possession of the property and would normally be given the responsibility to pay all mortgage payments, taxes, insurance and expenses of reasonable maintenance. If these costs would be less than the reasonable rental value of the property, it would appear equitable to offset any child or spousal support by one-half of the difference." (159 Cal.App.3d at p. 373, fn. 5.)

*Horowitz* dealt with a deferred sale order as to a purely community property home in which the ex-spouses had equal one-half interests. That is undoubtedly why Justice King suggested one-half the net fair rental value as the appropriate amount for an offset in that case. However, Justice King subsequently modified his view of what constitutes an "equitable" adjustment of support obligations: "Although we stated in *Horowitz* that it would be equitable to provide an offset against support to the extent of one-half the difference between the reasonable rental value and the housing expense attributable to the family home, in retrospect, this will usually be unnecessary and may result in inequity. In fact, as here, there usually is insufficient income available to allow all members of the postdivorce family to enjoy the same standard of living enjoyed when living together prior to separation." (*In re Marriage of Stallworth, supra*, 192 Cal.App.3d at p. 750.) Thus, the

rule appears to be that the decision to grant an offset for net fair rental value is a matter within the equitable discretion of the trial court, to be decided on a case-by-case basis, and will not be required in any particular amount if and when the trial court determines it would be equitable to order such an offset. (*Ibid.*; and see § 4057, subd. (b)(2).)

In this case, Daniel was found to have a separate property interest worth at least $34,396[20] in a house with a fair market value of $125,000 at the time of judgment. After accounting for Connie's parent's $10,000 lien, Daniel had a 27.5 percent separate property interest in the home. Daniel's one-half share of the community property portion of the home gave him another 32.25 percent, for a total interest of approximately 60 percent. That the offset chosen by the trial court was for only 50 percent of the net fair rental value was surely not an abuse of the trial court's discretion to adjust Daniel's child support obligations in an equitable manner. This offset arguably constituted a form of "rent" or "interest" to compensate Daniel for the loss of more lucrative uses of his equity. The trial court was free to deny Daniel's request for an offset altogether, at least as to his community property interest. (*In re Marriage of Stallworth*, *supra*, 192 Cal.App.3d at p. 750.) But it did not do so. Instead, it crafted an order that is sufficient to compensate Daniel fully for loss of use of his separate property interest and partially for loss of use of his community property. The trial court was not required to do any more. Indeed, by awarding Daniel a $249 offset against his $1,244 monthly child support obligation, the trial court had already reduced the guideline amount of support by over 20 percent. Had it awarded Daniel an offset at a higher percentage, it would likely have been called upon to revisit the issue of spousal support. In sum, the trial court carefully examined all the parties' needs, interests, and obligations, and struck a reasonable balance among them. There was no abuse of discretion in its decision to limit the offset to 50 percent of the net fair rental value.

### D. The Trial Court Erred When It Refused to Consider Daniel's Argument That, Rather Than a Fixed Sum of $34,396, He Should Recover a Percentage of the Proceeds From the Deferred Sale.

■ Daniel further contends that the trial court erred by fixing his separate property interest in the family home at $34,396,[21] to be reimbursed without appreciation at the time of sale, thereby rejecting his argument that

---

[20] See section II.D., and III.A., *post*.

[21] As we discuss in section III.A., *post*, Daniel has a separate property interest attributable to the $34,396 payment he made in March 1991 to retire the parties' mortgage, but not for the $10,000 he claimed to have paid from separate property funds for improvements to the family home. Thus, for convenience we will discuss in this section only separate property interest attributable to the March 1991 payment.

he is entitled to a percentage ownership interest in the home through which he can realize the appreciation, if any, in the value of his separate property share during the deferral period. We accept Daniel's argument on this point.

If the family home were subject to *immediate* sale and distribution of the proceeds in connection with a "division of the community estate," Daniel would be entitled only to reimbursement for the actual amount of separate property he contributed to the acquisition of the home, without any allowance for appreciation or interest[22] since the date he paid off the mortgage. (§ 2640, subd. (b).)[23] In this case, the trial court believed section 2640 likewise required it to order only reimbursement, at the time of the *deferred* sale, of the actual amount Daniel paid in March 1991 from his separate property funds to retire the parties' mortgage. We respectfully disagree. There is no indication that section 2640 was intended to apply where, as here, an out-spouse has a separate property interest in a family home as to which a deferred sale order has been entered, effectively tying up an *ex*-spouse's separate property interest—potentially, for many years—without affording him or her an opportunity to benefit from any appreciation in the value of that interest during the deferral period.

Indeed, application of section 2640 in the deferred sale context would be entirely inappropriate. A spouse who invests separate property funds in a family home during an ongoing marriage may fairly be charged with having done so for the benefit of the community and in the knowledge that, if the marriage should end, he or she would have to forego the interest or appreciation the separate funds could otherwise generate if maintained separately.

---

[22]As we have already discussed, the trial court had discretion to order an offset from Daniel's child support obligations at the level of 50 percent of the net fair rental value, which was arguably a type of "interest" or "rent" and sufficient to compensate him for the loss of use of his separate property and, at least to some extent, the loss of use of his community property. Although the trial court had the equitable discretion to give Daniel a higher percentage of the net fair rental value, it was not required to do so. (*In re Marriage of Stallworth, supra,* 192 Cal.App.3d at p. 750.) Indeed, to have done so may well have resulted in "inequity" in the allocation of income between the two postdivorce households (*ibid.*), and might have led to a reopening of the issue of spousal support.

[23]In relevant part, section 2640 provides: "(b) In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and shall not exceed the net value of the property at the time of the division." Although Connie has conceded that Daniel "had a separate property interest in the home," it is clear that Daniel obtained only a "tracing right of reimbursement" under section 2640 when he paid off the parties' mortgage, and not a true separate property interest, because there is no evidence either by way of the form of title or written agreement to show that the parties intended to maintain Daniel's investment as "separate property and not community property." (§ 2581.)

Pursuant to section 2640, it is reasonable to view such income or growth amounts as gifts to the community. But to require such a "gift" of an ex-spouse would be unreasonable, inequitable and—unlike the deprivation of the out-spouse's *possessory* interest in the family home—totally unnecessary to accomplish the purpose of the deferred sale order statute.[24] In the circumstances of this case, moreover, it would be a windfall to the in-spouse, whose community property share would continue to appreciate at the expense of the out-spouse's separate property share.[25]

One way to conceptualize the out-spouse's separate property interest in a family home as to which a deferred sale order is to be entered, and as to which the out-spouse has only a tracing right of reimbursement, is as a confirmed separate property interest in the now ex-spouse that is subjected to court-ordered reinvestment in the family home as a form of child support.[26] At that point, there is no longer any reason to apply marital property presumptions to either the in-spouse's or the out-spouse's interests. Except for the fact that the family law court retains jurisdiction to enforce, modify or terminate the deferred sale of home order (§§ 3807, 3809), the ex-spouse's respective interests should be viewed as ordinary joint ownership interests between individuals, in the nature of a tenancy in common. (See *In re Marriage of Stallworth*, *supra*, 192 Cal.App.3d at p. 748; *Horowitz*, *supra*, 159 Cal.App.3d at p. 373.)

---

[24]Likewise, it will frequently be unnecessary and "may result in inequity" to provide full compensation for the out-spouse's loss of *income* from his or her share of the family home where such compensation will simply increase the in-spouse's need for support. (*In re Marriage of Stallworth*, *supra*, 192 Cal.App.3d at p. 750.)

[25]Of course, recognizing the out-spouse's separate property interest in the family home as a percentage ownership interest would subject that interest to both positive and negative fluctuations in the market during the deferral period. If Daniel pursues this issue on remand and obtains an order granting him a percentage ownership interest, his share of the deferred sale proceeds will reflect either appreciation *or* depreciation in the value of the family home, depending on the market conditions at the time of sale. Thus, he will have traded the certainty of recovering $34,396 at the time of sale, for a chance to recover more but with a risk of recovering less.

[26]If the separate property investment had been maintained as a true separate property interest, by so specifying in the form of title or in a written agreement pursuant to section 2581, the out-spouse would be entitled to credit for appreciation both during and after the marriage, in a proportion that would depend, inter alia, on whether the home was acquired before or during the marriage. (Compare *In re Marriage of Lucas* (1980) 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285] [home acquired during marriage, with separate property down payment and community credit]; *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446 [152 Cal.Rptr. 668] [same]; with *In re Marriage of Moore* (1980) 28 Cal.3d 366 [168 Cal.Rptr. 662, 618 P.2d 208] [home acquired before marriage, with separate property title but mortgage paid down with community property funds]; and *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426 [181 Cal.Rptr. 910] [same]; and see generally, 2 Hogoboom & King, *supra*, ¶¶ 8:286-8:312, pp. 8-71 to 8-77.)

Under this view, the trial court could have reconfigured the title to the family home, recognizing the parties as tenants in common with unequal ownership interests[27] and, concomitantly, ordered that they be paid in proportion to those ownership interests at the time of sale of the family home. However, the trial court did not believe it had the discretion to award Daniel a percentage ownership interest in the family home. Having reached a contrary conclusion, we will remand to give the trial court an opportunity to reconsider this issue.

### III. Connie's Cross-appeal

#### A. *There Is Insufficient Evidence of Tracing to Support the Trial Court's Finding of a $10,000 Separate Property Interest in Daniel for Improvements to the Family Home.*

██ As we have discussed, Connie concedes that Daniel has a separate property interest in the family home worth at least $34,396 because of the lump-sum payoff of the parties' mortgage using separate property funds from his inheritance.[28] However, Connie challenges the trial court's determination that Daniel is to receive an additional $10,000 as reimbursement for improvements to the house, which were allegedly purchased with separate property funds.

Daniel was entitled to reimbursement for any contributions to improvements of the family home to the extent he could trace the contributions to a separate property source. (§ 2640, subd. (b); see also *In re Marriage of Martinez* (1984) 156 Cal.App.3d 20, 31 [202 Cal.Rptr. 646].) In this instance, the tracing runs through a commingled checking account into which Daniel undisputedly deposited $10,000 of his inheritance, but into which the parties also regularly deposited his community property paychecks throughout the period of remodeling. ██ Of course, the mere commingling of separate property and community property funds does not alter the status of

---

[27]It appears that the trial court did reform the title from a joint tenancy of Daniel, Connie and Connie's parents, to a tenancy in common with the same parties listed as tenants in common. However, the court further ordered that Connie's parents' interest was in reality that of a mortgage holder with a lien on the property for $10,000. It is unclear whether the tenancy in common between Connie and Daniel was drawn with the ex-spouses as equal owners of the property, or as owners in percentages that reflect their respective community property and community/separate property interests. The latter formulation is, we presume, what Daniel was seeking.

[28]As we discussed in section II. D., *ante*, the interest Daniel acquired by paying off the mortgage was, as of the time of dissolution, only a "tracing right of reimbursement" under section 2640. However, upon entry of the deferred sale of home order, that interest may be treated as a confirmed separate property interest that has been subjected to the support of his children pursuant to sections 3808 and 4008.

the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. (*Hicks* v. *Hicks* (1962) 211 Cal.App.2d 144, 154 [27 Cal.Rptr. 307].) But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of section 760. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 611 [122 Cal.Rptr. 79, 536 P.2d 479].)

Either of two tracing methods may be utilized to characterize the disputed property interests: "direct tracing," or "family living expense tracing." (*In re Marriage of Mix, supra*, 14 Cal.3d at p. 612.) Whether the spouse claiming a separate property interest has adequately traced an asset to a separate property source is a question of fact for the trial court, and its finding must be upheld if supported by substantial evidence. (See *In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 329 [249 Cal.Rptr. 798]; *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1010 [226 Cal.Rptr. 766].)

Under the "direct tracing" method, the disputed asset (in this case the improvements to the community property home) is traced to the withdrawal of separate property funds from the commingled account. This method requires *specific records* reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. Separate property status cannot be established by mere oral testimony of intent or by records that simply total up all separate property funds available during the relevant period and all the separate expenditures during that period; such records do not adequately trace to the source of the purchase at the time it was made. (*In re Marriage of Frick, supra*, 181 Cal.App.3d at p. 1012; and see 2 Hogoboom & King, *supra*, ¶¶ 8:527-8:528, pp. 8-130 to 8-131.)

Under the "family living expense" or "recapitulation" method, it is assumed that family living expenses are paid out of community property funds. (*Beam* v. *Bank of America* (1971) 6 Cal.3d 12, 20 [98 Cal.Rptr. 137, 490 P.2d 257]; *In re Marriage of Frick, supra*, 181 Cal.App.3d at p. 1010.) Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds. (*See* v. *See* (1966) 64 Cal.2d 778, 783 [51 Cal.Rptr. 888, 415 P.2d 776]; *Estate of Murphy* (1976) 15 Cal.3d 907, 918-919 [126 Cal.Rptr. 820, 544 P.2d 956].) The recapitulation must be sufficiently exhaustive to establish not only that separate property funds

were available to make the payments, but that they were actually used. (*Estate of Murphy, supra,* 15 Cal.3d at pp. 918-919.) As with direct tracing, the record must demonstrate that community income was depleted at the time the particular asset was acquired. (*See* v. *See, supra,* 64 Cal.2d at p. 783; and see 2 Hogoboom & King, *supra,* ¶¶ 8:529-8:531, pp. 8-131 to 8-132.)

██ Connie contends that Daniel did not produce sufficient evidence under either of these tests to trace the improvements back to a separate property source, as required by section 2640. Given the exacting standards of proof required for tracing funds in a commingled account, we agree. It is undisputed that in April and May 1991 Daniel made two withdrawals of $5,000 each from a separate account he maintained with Dean Witter, that all the funds in the Dean Witter account at the time were Daniel's separate property (from his inheritance), and that Connie deposited the $10,000 withdrawn by Daniel into the parties' joint checking account at Provident Credit Union. Daniel admitted that the Provident account was the parties' "main checking account," wherein Connie deposited his paychecks even after he converted his Dean Witter account into a joint account in June 1991. Connie, for her part, admitted that improvements were made to the family home in the spring of 1991, and that some payments were made at that time from the commingled Provident account to Schmidbauer Lumber for materials and to Keith Combs for labor. But there was *no proof* of the amounts expended on either the labor or the materials that went into the improvements. Indeed, Daniel admitted that he did not have any records to show that the $10,000 went into remodeling. There was, moreover, no proof of the balance in the Provident account before the remodeling began, the total of community income deposited into the Provident account, or the amounts withdrawn from the commingled account to cover family living expenses while the remodeling was going on. As far this record discloses, no documents relating to the Provident account were admitted into evidence at trial.

This evidence is legally inadequate to support a finding that $10,000 in separate property funds were used for improvements to the family home. Even when coupled with Connie's admissions, Daniel's testimony that he intended the funds withdrawn from his separate property account to be used for that purpose was plainly insufficient to support a finding that the $10,000 was actually used for that purpose. And there were no records to prove that community income in the Provident account had been depleted at the time the remodeling was being done. (*In re Marriage of Frick, supra,* 181 Cal.App.3d at p. 1012; see also *In re Marriage of McNeill, supra,* 160 Cal.App.3d at p. 564 [wife's claim for reimbursement of $49,000 allegedly spent on improvements defeated, in part, because she failed to produce

adequate records to establish tracing]; see also 2 Hogoboom & King, *supra*, ¶ 8:467, p. 8-117.) As Daniel thus failed to present sufficient evidence to trace the remodeling payments to a separate property source, we reverse that portion of the trial court's order by which he was awarded a $10,000 separate property interest in the family home for improvements.

B. *Substantial Evidence Supports the Trial Court's Finding That Daniel Had a Separate Property Interest in the $25,000 Withdrawn From the Dean Witter Account in September 1991.*

■ Connie further contends that Daniel did not produce sufficient evidence to trace a September 1991 withdrawal of $25,000 from the couple's joint Dean Witter account to a separate property source, as required by section 2640. Again, this issue presents a question of fact for the trial court and its finding must be upheld if supported by substantial evidence. (*In re Marriage of Higinbotham, supra,* 203 Cal.App.3d at p. 329.) On this point, we conclude that the evidence was sufficient, under the "direct" method of tracing, to support the trial court's finding that Daniel established a separate property claim to at least $20,734 of that $25,000.

It is undisputed that, in March 1991, Daniel inherited $65,129 from his grandmother. After paying off the couple's mortgage of $34,395, Daniel was left with $30,734, which he deposited into a Dean Witter account, No. 69-016-356-020. Daniel had separately maintained this Dean Witter account since his mother died in 1988 and, at the time of the $30,734 deposit, it already had a balance of approximately $9,000 from a previous inheritance. It is also undisputed that Daniel thereafter withdrew $5,000 on April 17 and on May 17, 1991, which funds were deposited in the couple's Provident checking account, as discussed in the preceding section. By May 31, 1991, Daniel had converted the separate Dean Witter account to a joint tenancy account, No. 169-018-985-A20. Connie agreed with Daniel's testimony on this point, and admitted that Daniel's separate account was converted to a joint account at her insistence because she was afraid the state would get the money if Daniel were to die in a truck accident. At that point, the parties began to use the Dean Witter account for household expenses. Bank records examined by the court showed that, in the three months (June, July, and August 1991) during which the couple maintained the joint account before the $25,000 withdrawal, an additional $6,050 in community property funds was deposited from Daniel's paychecks. The court also found based on the bank statements that, between the date of conversion and December 31, 1991, the couple withdrew a total of $35,030 from the commingled account —i.e., Daniel's withdrawal of $25,000, plus checks totalling $10,030 which were deemed to be for family living expenses.

The foregoing evidence is sufficient to support the trial court's finding that at least $20,734 of the $25,000 withdrawal was Daniel's separate property. Although its findings are quite confusing, it appears that the court calculated Daniel's separate property interest as follows: First, the court determined from the bank records before it that Daniel had documented a $30,734 deposit to his separate Dean Witter account, from which the court subtracted the two $5,000 withdrawals in April and May 1991. The court thus gave Daniel credit for at least $20,734 in separate funds in the account as of the time it was converted to a joint account at the end of May 1991. The court then considered that $6,050 in community funds were deposited from Daniel's paychecks in the period from June through August 1991, but found that that amount was more than exhausted by the $10,030 in community living expenses that were paid by check from the joint Dean Witter account. The only other withdrawal during that period was the $25,000 Daniel withdrew on September 9, 1991. Having accounted for and characterized all the separate and community deposits and payments from the joint account, the court concluded that at least $20,734 of the $25,000 withdrawal was attributable to his separate property inheritance from his grandmother.[29] Connie was, thus, awarded half of the difference between that amount and $25,000, or $2,133 as her share of the community property portion of the withdrawal. Connie offers no evidence or argument to suggest that the $20,734 could have come from any community source. On this record, we conclude that the trial court's finding of adequate tracing for that portion of the $25,000 withdrawal is supported by substantial evidence.

C. *The Trial Court Abused Its Discretion by Awarding Connie Only $500 in Attorney Fees Without Any Explanation or Other Apparent Basis in the Record for the Reduction in the Amount Claimed.*

At the conclusion of the trial of this matter on June 7, 1993, the trial court invited Connie's counsel, Donald Bicknell, to submit a declaration regarding attorney fees and costs. Mr. Bicknell did so on June 17, 1993, claiming a total of $6,675.50 for legal services rendered through the date of trial. On February 2, 1994, Mr. Bicknell supplemented that declaration, claiming that he had rendered another $2,606 worth of legal services in posttrial proceedings. As far as this record discloses, Daniel has at no time disputed the reasonableness of the services rendered or the amount of compensation claimed by Connie's attorney. Nevertheless, the trial court awarded Connie only $500 in attorney fees and offered no explanation for this drastic reduction of the amount claimed.

---

[29]Presumably, the court found that the additional $3,980 in community living expenses was covered by separate property funds that Daniel already had on deposit in his separate Dean Witter account before receiving the inheritance from his grandmother in March 1991.

Because there is no indication that the fee award in this case was ordered as a sanction pursuant to section 271 or Civil Code, former section 4370.6, we presume that it was a so-called "need-based" award predicated on what is "just and reasonable" given the "relative circumstances" of the parties, and what amount was "reasonably necessary" to adequately maintain or defend the action. (§ 2030; Civ. Code, former § 4370; and see generally, 3 Hogoboom & King, *supra*, ¶¶ 14:1-14:3, p. 14-1; *id.*, ¶¶ 14:155-14:211, pp. 14-34 to 14-48.) The purpose of a section 2030 fee award is to ensure that the parties have adequate resources to litigate the family law controversy and to effectuate the public policy favoring "parity between spouses in their ability to obtain legal representation." (§§ 2030, subd. (a), 2032, subd. (b); *In re Marriage of Sullivan.* (1984) 37 Cal.3d 762, 768 [209 Cal.Rptr. 354, 691 P.2d 1020]; see also *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 167 [18 Cal.Rptr.2d 743].) Daniel does not challenge the decision of the trial court to award fees to Connie for the trial court proceedings; thus, the only issue before us is Connie's claim that the trial court abused its discretion in determining the *amount* of her fee award.

It is well established in California that, although the trial court has considerable discretion in fashioning a need-based fee award (*In re Marriage of Sullivan, supra*, 37 Cal.3d at pp. 768-769), the record must reflect that the trial court actually exercised that discretion, and considered the statutory factors in exercising that discretion.[30] (*In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213, 1219 [215 Cal.Rptr. 789]; *In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 426-427 [190 Cal.Rptr. 885]; see also 3 Hogoboom & King, *supra*, ¶¶ 14:180-14:186, pp. 14-39 to 14-42.) The record presented in this appeal contains overwhelming evidence that, at the time of the trial court proceedings, Connie had no assets other than her share of the family home, no income other than child support,[31] and only the most minimal earning ability. Daniel, on the other hand, had substantial income, few expenses, and a large amount of separate property. There was no

---

[30]In addition to its consideration of what is "just and reasonable" under the "relative circumstances" of the parties (§ 2032), and what is "reasonably necessary" to maintain or defend the action, the trial court is required to consider certain factors developed in the case law for fixing the amount of a reasonable need-based fee award, including: the nature of the litigation; its difficulty; the amount in controversy; the skill required and employed in handling the litigation; the attention given; the success of the attorney's efforts; the attorney's learning and experience in the particular type of work demanded; the intricacies and importance of the litigation; the labor and the necessity for skilled legal training and ability in trying the cause; and the time consumed. (*In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 296 [149 Cal.Rptr. 918].) As we have observed, however, Daniel has never questioned the reasonableness of the services rendered by Mr. Bicknell, or the amount of fees charged for those services.

[31]Once again, Daniel suggests that Connie was being supported by Mr. Combs. As we have already observed, however, the evidence does not support this claim.

apparent reason for the trial court's decision to award fees so grossly disproportionate to those actually charged to the client. Where, as here, there was no showing that the time spent or fees charged were unreasonable, and the parties' respective financial circumstances clearly justify a higher fee award, such a drastic reduction in the requested amount cannot be sustained. (*In re Marriage of Fransen, supra*, 142 Cal.App.3d at pp. 426-427.) Accordingly, we will reverse this portion of the June 23, 1994, order and remand to afford the trial court the opportunity to explain the reduced award or to modify it in light of our discussion here.

## IV. CONCLUSION

For all the foregoing reasons, the June 23, 1994, "Order on Reserved Issues" is REVERSED to the extent it grants Daniel a $10,000 separate property interest for improvements to the family home, to the extent it denies Daniel the opportunity to recover appreciation in the value of his separate property interest in the house, and to the extent it limits Connie's fee award to $500. The cause is remanded to the trial court with directions to reconsider whether Daniel's separate property interest in the family home will be reimbursed at the time of sale as a fixed sum, or as a percentage of the net proceeds (to take into account appreciation/depreciation of his separate property share as of that time), and to reconsider Connie's attorney fee application under the factors set forth in sections 2030 and 2032. In all other respects, the judgment of the trial court is AFFIRMED.

Smith, Acting P. J., and Haerle, J., concurred.