Filed 5/6/16  Certified for Publication 5/27/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re the Marriage of BILLIE and DANE COOPER. | |
| BILLIE MILLER, | C073014 |
| Respondent, | (Super. Ct. No. 06FL04490) |
| v. | |
| DANE COOPER, | |
| Appellant. | |

In this marital dissolution case, the trial court found four investment accounts held in joint title by Billie Miller (wife) and Dane Cooper (husband) during their marriage to be wife's separate property.  The trial court also ordered that wife be reimbursed for her down payment of $40,000 on the marital residence on the ground her separate property was the source of the down payment.  After the parties separated, wife lived in the marital residence for approximately eight years.  For this time period, the trial court determined wife should be reimbursed for $36,040.25 she paid to maintain the residence.  (See *In re*

1

*Marriage of Epstein* (1979) 24 Cal.3d 76 (*Epstein*), superseded by statute on other grounds as noted in *In re Marriage of Prentis–Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1280.)  However, the trial court denied husband's request for the community to be reimbursed the fair rental value of the house during the same time period.  (See *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 (*Watts*).)

On appeal, husband contends (1) the jointly titled investment accounts are community property for which wife was not entitled to any reimbursement, (2) wife introduced insufficient evidence to show the separate property nature of the funds used to purchase the marital residence, and (3) the trial court abused its discretion by allowing wife to live rent-free in the marital residence during the years after separation while making husband pay half of the maintenance and repairs for which the community received no benefit.

We conclude the trial court erred in finding wife's tracing of the source of funds for the jointly titled investment accounts overcame the presumption that the jointly titled accounts belong to the community.  Wife did not introduce any document sufficient to overcome the title presumption imposed by Family Code section 2581.[1]  Nonetheless, wife is entitled to reimbursement for her separate property contributions to these investment accounts.  The documentary and testimonial evidence sufficed to show wife's contributions to the investment accounts originated from her separate property.  However, wife's oral testimony did not suffice to show her separate property was the source of the down payment on the marital residence.  Thus, the trial court erred in ordering her to be reimbursed for the down payment.  We conclude the trial court had discretion to conclude wife did not owe the community *Watts* charges (*Watts* charges) for

---

[1]     Undesignated statutory references are to the Family Code.

2

the fair rental value of the marital residence during the period after separation and before trial in this case when husband pursued redundant and unsuccessful marital dissolution litigation in Hawaii, a forum where the parties never lived together. (*Watts, supra,* 171 Cal.App.3d 366.) However, wife owes the community *Watts* charges for the other periods when she had exclusive use of the marital residence but there was no Hawaii litigation pending. Husband should not be ordered to pay *Epstein* credits (*Epstein* credits) to reimburse wife for the period in which the community is not entitled to *Watts* charges. However, wife is entitled to *Epstein* credits (*Epstein, supra,* 24 Cal.3d 76) for the periods when she owes *Watts* charges.

Accordingly, we reverse and remand.

FACTS

Husband and wife married on February 14, 1988. Thereafter, they opened various joint investment accounts and purchased a house in Elk Grove. The details of these transactions will be set forth in greater detail later in this opinion. The parties physically separated sometime in 1995, when husband, an Air Force officer, was transferred from McClellan Air Force Base in Sacramento to Wright-Patterson Air Force Base in Ohio. Wife, a college professor and Army Reserve officer, stayed in the Sacramento area to retain her position with the Los Rios Community College District. However, based on evidence neither party considered the marriage over until June 1, 2004, the trial court determined that to be the date of legal separation, a ruling that is not challenged on appeal.

In 2005, husband filed for dissolution of the marriage in Hawaii, where he was stationed at the time. In 2006, wife filed for dissolution of the marriage in California; she continued to reside in the Elk Grove house. The California action was stayed pending resolution of the Hawaii action. The Hawaii action was later dismissed for lack of jurisdiction. Husband unsuccessfully appealed to the Intermediate Court of

3

Appeals in that state, and thereafter unsuccessfully sought review in the Hawaii Supreme Court. In 2011, after the Hawaii Supreme Court denied review, the California action proceeded.

In August 2012, the parties stipulated to a number of property-related matters. Among other things, they agreed the Elk Grove house would be awarded to wife, who would pay husband half of the property's appraised value as his community property interest therein, but reserved the court's jurisdiction to determine whether wife should be required to pay *Watts* charges to the community, i.e., the fair rental value of the house during the time she lived there after the separation, and whether wife should receive *Epstein* credits, i.e., reimbursement from the community for repair and maintenance expenses she incurred during that time. The parties also agreed a valuation of the joint investment accounts would be done by a neutral and qualified party and reserved the court's jurisdiction to order division of those accounts. Other matters were also agreed to, but are not pertinent to the issues raised on appeal.

On October 4, 2012, the trial court entered a judgment of dissolution as to status only and reserved jurisdiction as to all other matters. Thereafter, wife filed a statement of issues and contentions, arguing a number of property-related issues. The following are relevant to the issues raised on appeal. With respect to the investment accounts, wife noted she hired Larry Boehm, a retired supervisory special agent for the Internal Revenue Service's Criminal Investigation Division, to trace these accounts to their original sources and stated the parties may be able to come to an agreement "as to what portion of the accounts is community and what is separate property." With respect to the Elk Grove house, previously agreed to be community property, wife asserted she should be reimbursed the amount of the down payment that she claimed was made with her separate property. Wife also argued she was entitled to *Epstein* credits in the amount of

4

$38,689 for expenditures made to repair and maintain the Elk Grove house after the separation.

With respect to *Watts* charges, wife admitted living in the house after the separation and acknowledged the community, "[u]nder ordinary circumstances," would be entitled to reimbursement for the fair rental value of the house during her exclusive post-separation possession, about $1,600 per month according to her valuation. She argued awarding such charges in this case, however, would be inequitable because husband initially filed for dissolution in Hawaii, and then appealed the dismissal of that case all the way to the Hawaii Supreme Court, forcing wife to incur over $60,000 in attorney fees and delaying this case for six years. The trial court should not, she argued, allow husband to "profit" from these actions. Instead, because husband "could have dropped the Hawaii case any time after 2006 and this matter would have been resolved 6 years earlier," and because husband "left Hawaii 6 weeks after he filed" that lawsuit, and therefore "neither party resided in Hawaii" for the majority of the time that case proceeded in the Hawaii courts, the trial court should deny husband's request for equitable relief under *Watts*. Wife further argued because she was busy litigating the Hawaii case, she did not consult a California attorney regarding potential *Watts* charges until 2011, when this case resumed; therefore, if such charges were to be assessed, they should be assessed not from the date of separation, but from the date this case resumed.

In response, husband filed a trial brief arguing because the investment accounts were opened after marriage and held in their joint names, they are presumed to be community property, and wife would not be able to rebut that presumption at trial or prove entitlement to separate property reimbursement from these accounts. With respect to the Elk Grove house, husband argued because the house was purchased after marriage with community funds and held in their joint names, the trial court should divide the

5

house along the lines already agreed upon, i.e., award the house to wife and order payment to husband of $130,000, i.e., half the appraised value of $260,000, with no reimbursement to wife for the down payment. Husband did not dispute wife's entitlement to *Epstein* credits for repair and maintenance expenditures. He did, however, dispute her calculation of such credits, arguing because there was no agreement as to the need for the expenditures, the fair market value of the property after the expenditures minus the fair market value before the expenditures should be the measure of *Epstein* credits. Finally, with respect to *Watts* charges, husband argued the community was entitled to such charges at a fair rental value of about $1,800 per month when property values were low and about $3,200 per month when property values were high, for a total of more than $300,000 during the eight-year period of wife's post-separation possession. Apparently addressing wife's argument regarding the delay caused by the Hawaii action, under a separate heading of his trial brief, husband argued he "offered to transfer the action to a different forum if [wife] would agree to bifurcate the property issues from the issue of status and allow him to terminate the status of the marriage" and appealed the Hawaii court's decision to dismiss the case only after wife "refused this offer." Husband further argued, after he lost his appeals and the California case resumed, wife caused "numerous delays" in this case, including "the need for a trial on the separation date, [a] request for reconsideration of that court decision[,] . . . delay in getting paperwork signed," and "fail[ure] to respond to repeated requests for discovery."

Trial commenced on October 11, 2012. Husband and wife each testified, as did Boehm, the forensic accountant retained by wife to trace the sources of the various investment accounts. The record does not contain a reporter's transcript of the trial. Instead, we have a settled statement setting forth a summary of the testimony. A binder containing account statements for 20 investment accounts and summaries of each

6

account's transaction history (Exhibit P) that was prepared by Boehm was also admitted into evidence.

Four specific investment accounts are the subject of husband's first contention on appeal: three Franklin Templeton accounts with account numbers ending in 9961, 3412, and 0768; and one Pioneer account with an account number ending in 2830. Each of these accounts was opened during the marriage and held jointly by the parties. Pioneer account 2830 was opened April 27, 1989, with a transfer of funds from another Pioneer account with an account number ending in 6605 that was opened by wife before the marriage. No other investment purchases were made in this account. Franklin Templeton accounts 9961 and 0768 were opened February 21, 1991, each with an initial investment purchase of $25,000. No other investment purchases were made in these accounts. Franklin Templeton account 3412 was opened March 17, 1989, with a transfer of shares from another Franklin Templeton account with an account number ending in 9225 that was also opened during the marriage but held in wife's name only. Between February 1990 and February 1991, various investment purchases totaling $20,000 were made in this account using two joint bank accounts. On February 19, 1991, two days before Franklin Templeton accounts 9961 and 0768 were opened, a $50,000 investment purchase was also made. Boehm testified the likely source of this $50,000 investment purchase, as well as the two investment purchases of $25,000 each, that opened Franklin Templeton accounts 9961 and 0768, was wife's sale of a separate property house that was sold less than 30 days before these purchases were made and the net proceeds of which were just under $100,000.

Wife also testified the proceeds of the sale of her separate property house "were deposited into three investment accounts," specifically referencing Franklin Templeton accounts 0768 and 9961. From the settled statement, it does not appear husband's testimony directly disputed these investment purchases were made with wife's separate

funds. He did, however, maintain the jointly-held investment accounts were community property. He also testified "the community paid taxes on the capital gains from the investment accounts," explaining, "the years where taxes were withdrawn from the accounts is clearly noted on account statements," and where there are no such withdrawals from the accounts themselves, the taxes were paid out of their salaries, further explaining that "he actually wrote the checks to pay the taxes, and did so out of his own checking account which held community funds," although he "did not provide any evidence of such payments."

With respect to the purchase of the Elk Grove house, wife testified the house was purchased on October 16, 1991, and the down payment, $40,656.93, "came from her separate property," i.e., "savings/investments she accumulated prior to marriage." Wife further testified husband "had no savings or investments at the date of marriage" and "there was not enough time (1988-1991) for the community to build up a savings of $40,000.00+ to make the down payment." Husband testified, "the down payment must have come from community savings."

With respect to *Epstein* credits and *Watts* charges, wife admitted to having exclusive possession of the Elk Grove house from the date of separation to the time of trial, explained there was no mortgage on the house, although she did not state when the mortgage was paid off, and further explained she paid the property taxes (in the amount of $19,335.64) and homeowner's insurance premiums (in the amount of $8,948.68) during that time. Wife also testified the house "needed certain repairs and maintenance" following the separation, costing her a total of $45,385.25. Various invoices and statements supporting these figures were admitted into evidence. Wife further testified the fair rental value of the house was $1,600 per month, an opinion based on "what houses in her neighborhood similar in size were renting for," but disputed owing the community *Watts* charges because husband "purposefully delayed the dissolution of

8

marriage" by filing suit in Hawaii and then appealing the dismissal of the case to the Hawaii Supreme Court.

Husband testified, "the fair rental value was $4,556 per month in June 2004, and thereafter declined linearly each month such that it was $3,893 in May 2006, and $1,791 in July 2012," for a total of $358,097 owed to the community during wife's exclusive post-separation possession of the house. Husband acknowledged on cross-examination, however, he was not a real estate agent, had no expertise in real estate, and had not "consulted any real estate professional regarding the rental rates in Sacramento/Elk Grove in 2004-2006." He also "provided a calculation of the present value of [the] improvements [wife made to the house], given the economic life of those improvements and the fact that [wife] would be keeping the house," concluding, "the present value of these improvements was $2,566."

On November 15, 2012, the trial court issued a statement of decision. As relevant to the issues raised on appeal, the trial court found the foregoing investment accounts to be wife's separate property. The trial court also found wife made a down payment of $40,000 from her separate property on the Elk Grove house and ordered that she be reimbursed in that amount. The trial court further awarded wife *Epstein* credits in the amount of $36,040.25 for post-separation repair and maintenance expenditures and denied husband's request for *Watts* charges on equitable grounds. Judgment was entered January 9, 2013. Husband filed a timely notice of appeal.

DISCUSSION

I

***Standard of Review***

We first note this is an appeal on a short record, in which a settled statement summarizes the evidence adduced during the trial. In such a case, "we are bound to assume that enough appears [in the record] to enable us to decide whether reversible error

9

was committed and we must make our ruling upon the basis of what affirmatively appears in the record." (*Sloan v. Stearns* (1955) 137 Cal.App.2d 289, 293, citing former rule 52 of the Rules on Appeal (now Cal. Rules of Court, rule 8.163) and *In re Estate of Pierce* (1948) 32 Cal.2d 265, 274.) Thus, "the evidence to support the essential findings and conclusions [of the trial court] must be found in the settled statement or the judgment must fall." (*Kovacik v. Reed* (1957) 49 Cal.2d 166, 170.)

"We review the trial court's factual findings regarding the existence and character of the parties' property under the substantial evidence standard. The trial court's selection of what legal principles to apply is subject to de novo review. [Citation.] This includes the choice of the applicable standard of proof, which is a question of law that we review de novo. [Citation.]" (*In re Marriage of Ettefagh* (2007) 150 Cal.App.4th 1578, 1584.)

## II

### *The Jointly Titled Investment Accounts (Franklin Templeton Nos. 9961, 3412, 0768, and Pioneer No. 2830)*

Husband contends the trial court erred in finding wife owned as her separate property three Franklin Templeton accounts with account numbers ending in 9961, 3412, and 0768, and one Pioneer account with an account number ending in 2830. We agree.

### A.

### *Evidence Regarding the Jointly Titled Investment Accounts*

Each of the four investment accounts at issue was opened during the marriage and the statements for these accounts all note husband and wife were joint tenants. Although wife and wife's forensic accountant testified about the source of the funds for these accounts, no written document was introduced to show the parties intended the investment accounts to be wife's separate property. Instead, the testimonial and

10

documentary evidence showed the source of the funds for these four investment accounts likely came from wife's separate property. By contrast, husband "alluded to but did not establish through testimony or documentation that the source of these funds were from community funds."

**B.**

*Title Presumption for Property Held in Joint Title*

Generally, property acquired by married persons during the marriage while domiciled in California is community property. (§ 760.) By contrast, "[p]roperty owned before marriage or acquired during marriage by gift, will, or inheritance is separate property." (Cal. Const., art. I, § 21.) The characterization of property as community or separate usually depends on when the property was acquired. (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 732.) Thus, property acquired during marriage is subject to the rebuttable presumption that it is community property. (*Id.* at p. 733.) "This is a rebuttable presumption affecting the burden of proof; hence it can be overcome by the party contesting community property status. [Citation.] Since this general community property presumption is not a title presumption, virtually any credible evidence may be used to overcome it, including tracing the asset to a separate property source, showing an agreement or clear understanding between parties regarding ownership status and presenting evidence the item was acquired as a gift." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 290 (*Haines*).) The party seeking to rebut the community property presumption must do so by a preponderance of the evidence. (*In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1491 (*Peters*).)

However, when a party acquires property during marriage in joint title form, the presumption of section 2581 applies. Section 2581 provides: "For the purpose of division of property on dissolution of marriage or legal separation of the parties, property acquired by the parties during marriage in joint form, including property held in tenancy

11

in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property.  This presumption is a presumption affecting the burden of proof and may be rebutted by either of the following:  [¶]  (a) A clear statement in the deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property.  [¶]  (b) Proof that the parties have made a written agreement that the property is separate property." (§ 2581.)

As a leading treatise explains, "[t]he § 2581 presumption attaches to any type of *joint title* acquisition by spouses during marriage (real and personal property, whether tenancy in common, joint tenancy, tenancy by the entirety or community property). [§ 2581]  [¶]  As a result, *stocks, motor vehicles, boats, any form of real property*, and any other assets acquired in joint title form during marriage are presumptively community property."  (Hogoboom & King, Cal. Practice Guide:  Family Law (The Rutter Group 2015) ¶ 8:410, p. 8–145-146.)

Under section 2581, the joint title presumption cannot be overcome by tracing the source of funds for the property acquired during marriage to a party's separate property. (*Haines*, *supra*, 33 Cal.App.4th at p. 291 [interpreting predecessor statute to section 2581].)  Further, "under section 2581 spouses cannot hold property in joint title while preserving the property's separate property characterization through oral or implied agreements."  (*In re Marriage of Weaver* (2005) 127 Cal.App.4th 858, 865.)  As pertinent to this case, the joint title presumption can only be overcome by clear and convincing evidence in the form of a written document.[2]  (§ 2581; *In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 486.)

---

[2]     The joint title presumption can also be overcome by proof of undue influence by one spouse over another.  (*Haines, supra*, 33 Cal.App.4th at pp. 301–302.)  In this case,

12

If separate property was converted to joint title, the reason for the conversion does not affect the burden of proof of requirement in section 2581 of a writing to show intent to retain the separate property nature of the asset. (*In re Marriage of Neal* (1984) 153 Cal.App.3d 117, 124, fn. 12 (*Neal*), disapproved on other grounds in *In re Marriage of Buol* (1985) 39 Cal.3d 751, 758, fn. 8; *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 451, fn. 13.)

The four investment accounts at issue here (Franklin Templeton Nos. 9961, 3412, 0768, and Pioneer No. 2830) are all held in joint title form. Consequently, the joint title presumption applies to render these accounts community property in the absence of written evidence showing an intent to preserve the separate property nature of the accounts. (§ 2851.) Because no documentary evidence was introduced to rebut the joint title presumption, the trial court erred in concluding the four jointly titled investment accounts are wife's separate property.

Wife points out the investment accounts were originally held in her name alone. As the settled statement indicates, wife changed the accounts to share joint title with husband "because the military had instructed her to do so in order to protect the welfare of her son who was a minor at the time." Although the trial court noted that "this advice made sense" and was the reason for the change, the reason for the change to joint title does not overcome the presumption of section 2581. (*Neal*, *supra*, 153 Cal.App.3d at p. 124, fn. 12.)

Wife also points out the evidence supported the trial court's finding she was able to trace the source of the investment accounts to the sale of her separate property residence. As we note above, tracing of assets from separate property sources does not

however, there is no allegation of undue influence to overcome the joint title presumption.

13

overcome the joint title presumption. (*Marriage of Weaver*, *supra*, 224 Cal.App.3d at p. 486.) To overcome the presumption, documentary evidence of intent to preserve the separate property nature of the investment accounts was necessary.

We also reject wife's contention there is documentary evidence in the form of the statements issued to the parties by the companies that held the investment accounts. Section 2581 requires documentary evidence showing either that the jointly titled property "is separate property and not community property" or that "the parties have made a written agreement that the property is separate property." Here, the investment account statements show neither -- they merely show the investments held in the jointly titled accounts.

In short, no documentary evidence was introduced at trial to overcome section 2581's presumption that the four investment accounts at issue were community property.

## C.

### *Wife's Right of Reimbursement*

However, the evidence that traced the source of the investment accounts to wife's separate property funds is pertinent to her entitlement to reimbursement. In *Marriage of Weaver*, the court noted that "even if property held in joint tenancy loses its separate property characterization under section 2581, section 2640 provides a right to reimbursement upon dissolution for the spouse who contributed separate property to the acquisition of property held in joint title, absent a written waiver of the right to reimbursement." (127 Cal.App.4th at p. 865.) To this end, subdivision (b) of section 2640 provides that "unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property

14

source.  The amount reimbursed shall be without interest or adjustment for change in monetary values and may not exceed the net value of the property at the time of the division."

As the California Supreme Court has explained, "post-marital property can be established to be separate property by two independent methods of tracing.  The first method involves direct tracing. . . .  The second method involves consideration of family expenses." (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 612 (*Mix*).)  "Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds.  [Citations.]  Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823 (*Braud*).)

The question of whether a spouse "has adequately traced an asset to a separate property source is a question of fact for the trial court, and its finding must be upheld if supported by substantial evidence." (*Braud, supra*, 45 Cal.App.4th at p. 823.)  Here, substantial evidence supports the trial court's finding wife's forensic accounting sufficed "to trace the deposits and withdrawals of these accounts" and show her funds from the sale of her separate property home provided the funds for the four investment accounts at issue.  The record shows that:

- Pioneer No. 2830 was opened with $206,393.11 "prior to marriage and in [wife's] name alone" and no contributions were made during the marriage.  It was converted to joint title during the marriage.
- Franklin Templeton No. 0768, according to Exhibit P, was funded on February 21, 1991, by a $25,000 " 'direct purchase' -- likely source is from sale of

15

Demaret residence 1/25/91 [¶] See ck #105 from DSC & BMC." The Demaret residence was wife's separate property.

- Franklin Templeton No. 3412 was opened with wife's separate property funds and no contributions were made during the marriage. Exhibit P bears the following notation for deposit of $50,000 on February 19, 1991: "direct purchase; likely source is from proceeds of sale of Demaret Dr. property."

- Franklin Templeton No. 9961, according to wife's testimony, was opened with proceeds from the sale of her separate property residence and no contributions were made during the marriage. Exhibit P states that, in 1991, this "account opened with purchase of $25,000.00; proceeds appear to [be] part of the proceeds from the sale of [wife's] separate property, 7031 Demaret Drive., Sacramento, CA (see separate file on Demaret Dr. property for details)."

For the three Franklin Templeton accounts, "Boehm opined that the likely source of funds came from the sale of [wife's] separate property home located at 7031 Demaret Drive, Sacramento, CA since it was sold on January 25, 1991, less than 30 days from the date of opening the account and he could see no accounting of the funds." Wife, however, expressed certainty the sale of her separate property residence was the source of the three Franklin Templeton accounts at issue.

Taken together this documentary and testimonial evidence suffices to support the trial court's findings about the separate property sources for the investment accounts. (*Mix, supra,* 14 Cal.3d at p. 613.) In *Mix,* wife "introduced into evidence a schedule compiled by herself and her accountant from her records which itemized chronologically each source of separate funds, each expenditure for separate property purposes, and the balance of separate property funds remaining after each such expenditure." (*Id.* at p.

16

613.) Husband argued the schedule did not provide substantial evidence for purposes of tracing the purported separate property. (*Ibid.*) The *Mix* court agreed that "the schedule by itself is wholly inadequate," but found the evidence to be sufficient when including wife's testimony. (*Id.* at p. 614.) Wife "personally testified that the schedule was a true and accurate record, that it accurately reflected the receipts and expenditures as accomplished through various bank accounts, although she could not in all instances correlate the items of the schedule with a particular bank account, and that it accurately corroborated her intention throughout her marriage to make these expenditures for separate property purposes, notwithstanding her use of the balance of her separate property receipts for family expenses." (*Ibid.*) Taken together with the schedule, the evidence was sufficient. (*Ibid.*)

Here too, the exhibits and testimony by wife and her forensic accountant suffice to establish all four investment accounts were funded with wife's separate property. Exhibit P shows wife opened the Pioneer account prior to marriage and converted it to joint title during the marriage. And the testimony confirmed the timing of three Franklin Templeton investment accounts at issue as having been funded within a month of the sale of wife's separate property residence.

Husband argues Boehm's testimony about the "likely" source of the funds for the Franklin Templeton accounts provides insufficient certainty to support the trial court's finding about the separate property source of the funds. We disagree. Wife was required to rebut the community property presumption by a preponderance of the evidence. (*Peters*, *supra*, 52 Cal.App.4th at p. 1491.) That the forensic accountant testified about the "likely" source of funds did not mean his testimony did not meet wife's burden of proof. Indeed, CACI No. 200 defines a preponderance of the evidence in plain English to mean "more likely to be true than not true." On this record, wife met her burden of proof

17

in rebutting the community property presumption regarding the separate property source of funds.

In the absence of any writing indicating an intent by wife to waive her right of reimbursement, she is entitled to her separate property contribution to Franklin Templeton Nos. 9961, 3412, 0768, and Pioneer No. 2830.

### III

### *Down Payment on the Marital Residence*

Husband argues the trial court erred in ordering wife be reimbursed $40,656.93 for her separate property contribution to the down payment made on marital residence. We agree.

### A.

### *Evidence Regarding the Down Payment*

As the settled statement recounts, wife "testified that she and [husband] purchased a home on October 16, 1991 in Elk Grove, CA and that the down payment on the marital home came from her separate property. She testified, without opposition, that it was $40,656.93. She testified that the funds came from the savings/investments she accumulated prior to marriage. She also testified [husband] had no savings or investments at the date of marriage. She also testified that there was not enough time (1988-1991) for the community to build up a savings of $40,000.00+ to make the down payment. [Wife] also testified that no account statement obtained in all 20 accounts tabbed in Exhibit P contain any deposits from [husband's] separate checking/saving account from 1988-1991. She specifically referred to all 20 Tabs contained in the binder."

Boehm did not testify about the source of the down payment on the marital residence.

18

## B.

### *Adequacy of Tracing*

The trial court erred in finding the down payment on the marital residence was wife's separate property on grounds wife "had substantial savings at the time of the marriage" and husband did not prove he made any contribution to the down payment. As we explained in part II C., above, a party may establish entitlement to reimbursement by tracing separate property contributions to property acquired by the community during the marriage. However, oral testimony of intent does not suffice to overcome the presumption that property acquired during marriage belongs to the community. (*Braud, supra,* 45 Cal.App.4th at p. 823.) Instead, direct tracing to a separate source requires reference to specific written records showing the source of the funds. (*Ibid.*)

Our review of the record reveals no documents showing the source of the payment on the marital residence, and wife does not cite any in her respondent's brief other than to cite "Exhibit P" as a whole. However, none of the account statements collected in Exhibit P shows a withdrawal of any amount approximating the $40,656.93 down payment made in 1991.

In short, the trial court erred in ordering wife to be reimbursed for the down payment on the marital residence acquired three years after the parties married.

## IV

### *Epstein Credits and Watts Charges*

In two related arguments, husband asserts the trial court erred in denying his request for *Watts* charges and in granting wife's request for *Epstein* credits. We conclude wife's exclusive use of the marital residence was subject to *Watts* charges for the periods when there was no litigation in Hawaii and wife's *Watts* charges should be offset by *Epstein* credits for her preservation of the community asset.

## A.

### *Credits and Charges for Exclusive Use of Community Asset after Separation*

Section 2550 provides that a court must "divide the community estate of the parties equally" unless the parties agree otherwise.  Generally, a spouse who uses separate funds to pay community obligations is entitled to reimbursement for such expenditures.  (*Epstein*, *supra*, 24 Cal.3d at p. 84.)  Conversely, a spouse who has exclusive use of community property such as a house after the parties have separated must reimburse the community for the use of the residence.  (*Watts*, *supra*, 171 Cal.App.3d at p. 374.)

The determinations of *Watts* charges and *Epstein* credits are matters addressed to the sound discretion of the trial court.  "When a trial court concludes that property contains both separate and community interests, the court has broad discretion to fashion an apportionment of interests that is equitable under the circumstances of the case."  (*In re Marriage of Steinberger* (2001) 91 Cal.App.4th 1449, 1459; accord *Hebbring v. Hebbring* (1989) 207 Cal.App.3d 1260, 1272.)  Stated another way, "reimbursement is not automatic, but involves the consideration of . . . a variety of factors" such as whether the parties had an agreement, the rental value of the asset being used exclusively by one spouse, whether the conduct of one spouse led to losses to the community, whether exclusive use of the asset represented a duty of support, and additional considerations. (*In re Marriage of Feldner* (1995) 40 Cal.App.4th 617, 625.)

## B.

### *Watts Charges*

Husband argues the trial court erred in denying his request for *Watts* charges for the fair rental value of the marital residence during the time after separation when wife had exclusive use of the residence.  As we explain, we agree in part.

20

In pretrial briefing, wife's counsel stated wife "has incurred $63,845.67 in attorney fees in Hawaii just so that the case could conclude and she could proceed in this case." And at trial in this case, wife "testified that [husband] purposefully delayed the dissolution of marriage by filing several appeals in Hawaii. She testified that [husband[3]] filed for dissolution of marriage in Hawaii in 2005. Upon [wife's] motion, the trial court in Hawaii dismissed the case and [husband] filed an appeal. [Wife] testified that [husband] lost the appeal and applied to have the case heard by the Hawaii State Supreme Court. She testified that on May 19, 2011 the State Supreme Court denied [husband's] application, after which, this case could proceed." Wife estimated the fair rental value of the marital residence was $1,600 per month.

The trial court denied the *Watts* charges because husband "commenced an action in Hawaii that prolonged the dissolution process and created incredible expense for" wife so that "[t]he relief [husband] is requesting would result in an inequitable award to him." The trial court did not abuse its discretion in denying husband's request for *Watts* charges for wife's use of the marital residence during the period in which he litigated a redundant dissolution action in a state in which the parties had never lived together. Husband's insistence on litigating the issue of residence in Hawaii was the cause of the long period during which wife lived in the marital residence after separation but before final judgment was entered. The redundant and unsuccessful litigation was also the source of wife's expenditure of more than $63,000 in legal fees in Hawaii. Thus, we reject

---

**3**      The settled statement erroneously indicates it was "Petitioner" (i.e., wife) who filed the dissolution action in Hawaii. The parties agree husband filed the Hawaii dissolution action.

husband's contention regarding *Watts* charges for the period when the Hawaii case was pending -- from 2005 to July 2011.[4]

However, the trial court should have imposed *Watts* charges for the period wife had exclusive use of the marital residence after separation but before the Hawaii dissolution action was commenced -- i.e., from June 2004 until 2005. And the trial court should have imposed *Watts* charges for exclusive use of the house from July 2011 until the date of trial in this case in October 2012. Accordingly, the trial court's denial of all *Watts* charges erred to the extent wife must reimburse the community for her exclusive use of the marital residence after separation and before the date of the trial during times when there was no Hawaii litigation.

## C.

### *Epstein Credits*

Husband contends the trial court erroneously ordered him to pay *Epstein* credits to reimburse wife for maintenance and repair to the residence even though the community received no benefit from the expenditures. As with the *Watts* charges, we agree in part.

As we noted above, a spouse who uses separate property funds after the date of separation to pay community debts is entitled to reimbursement out of the community property at dissolution absent circumstances that would make reimbursement inappropriate. (*Epstein, supra*, 24 Cal.3d at pp. 84–85.) Here, the trial court found that "the Property taxes in the amount of $19,335.64 and homeowners insurance premiums in the amount of $8,948.68 are the sole responsibility of" wife. However, the trial court awarded wife "one-half reimbursement for the maintenance and repair" of the marital

---

[4]    The record does not establish when in 2005 husband filed for dissolution in Hawaii.

22

residence for the period after separation during which wife had exclusive use of the property. The judgment states that "[t]he community shall reimburse [wife] the amount of $36,040.25 as per evidence presented at trial, for expenditures to repair and maintain the" marital residence.

Insofar as we conclude the trial court properly denied husband's request for *Watts* charges during the time period spanning the Hawaii litigation, the trial court erred in awarding this *Epstein* credit because the community received no benefit from wife's preservation of the marital residence by payment of taxes, maintenance, or repair during a period in which she had exclusive use of the house. The evidence does not suggest the maintenance and repair increased the value of the property, but only that wife made the necessary expenditures to "preserve the asset."

However, insofar as the trial court erred in denying husband's request for *Watts* charges during the period after separation and before trial in this case *and* while the Hawaii litigation was not pending, wife is entitled to offset the fair rental value of the marital residence for which she must reimburse the community. Her testimony established she "made the mortgage payments, paid maintenance bills, property taxes and homeowner's insurance from her income." If the community is to reap the fair rental value of the marital residence it must also bear these burdens of asset preservation shouldered solely by wife. (*Epstein*, *supra*, 24 Cal.3d at p. 84.) On remand, the trial court shall award to wife *Epstein* credits only for the periods in which she owes *Watts* charges.

## DISPOSITION

The judgment is reversed and remanded with instructions to (1) characterize as community property the following investment accounts: Franklin Templeton ending in numbers 9961, 3412, 0768, and Pioneer ending in number 2830, (2) reimburse wife for her separate property contributions to these four investment accounts, (3) order wife to

pay *Watts* charges (*Watts, supra,* 171 Cal.App.3d 366) for the monthly rental value of the house during the periods when she had exclusive use of the marital residence after separation and before trial during which the Hawaii dissolution action was not pending, and (4) award to wife *Epstein* credits (*Epstein, supra,* 24 Cal.3d 76) for the periods in which she owes the community *Watts* charges. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (5).)

/s/
HOCH, J.

We concur:

/s/
HULL, Acting P. J.

/s/
MURRAY, J.

<u>CERTIFIED FOR PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re the Marriage of BILLIE and DANE COOPER. | |
| BILLIE MILLER, | C073014 |
| Respondent, | (Super. Ct. No. 06FL04490) |
| v. | |
| DANE COOPER, | ORDER MODIFYING OPINION, DENYING PETITION FOR REHEARING, AND GRANTING REQUEST TO PUBLISH |
| Appellant. | |
| | [CHANGE IN JUDGMENT] |

THE COURT:

APPEAL from a judgment of the Superior Court of Sacramento County, Sharon A. Lueras, Judge.  Reversed and remanded with instructions.

Law Office of Stephanie J. Finelli and Stephanie J. Finelli for Appellant.

Law Offices of Goodwin & Alexander and Harrison L. Goodwin for Respondent.

The opinion filed May 6, 2016, in the above cause is modified as follows:

On pages 23 to 24, delete the first sentence of the disposition and replace with:

The judgment is reversed and remanded with instructions to (1) characterize as

community property the following investment accounts: Franklin Templeton ending in numbers 9961, 3412, 0768, and Pioneer ending in number 2830, (2) reimburse wife for her separate property contributions to these four investment accounts, (3) deny wife's claim for reimbursement of $40,656.93 as her separate property for her contribution to the down payment made on marital residence, (4) order wife to pay *Watts* charges (*Watts, supra*, 171 Cal.App.3d 366) for the monthly rental value of the house during the periods when she had exclusive use of the marital residence after separation and before trial during which the Hawaii dissolution action was not pending, and (5) award to wife *Epstein* credits (*Epstein, supra*, 24 Cal.3d 76) for the periods in which she owes the community *Watts* charges.

This modification does change the judgment.

The petition for rehearing is denied.

Good cause appearing, appellant's request to publish is granted.


_____/s/_____
HULL, Acting P. J.


_____/s/_____
MURRAY, J.


_____/s/_____
HOCH, J.


2