Filed 6/16/22  Marriage of Cruz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of MAGDALENA and ADRIAN ANTHONY CRUZ. | |
| MAGDALENA CRUZ, Respondent, v. ADRIAN ANTHONY CRUZ, Appellant. | F080063 (Super. Ct. No. S1501FL628590) **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Jose R. Benevides, Judge.

Law Offices of Edward J. Thomas, Edward J. Thomas and Paul R. Domen for Appellant.

Swanson O'Dell, and Jeremy D. Swanson for Respondent.

-ooOoo-

Appellant Adrian Anthony Cruz (Adrian) appeals from an order (subject order) issued after entry of a judgment of marital dissolution from respondent Magdalena Cruz

(Magdalena).[1]  The subject order denied Adrian's request for reimbursement from the community estate of alleged separate property expenditures he made to preserve community property after the parties' date of separation (*Epstein* credits, under *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84 (*Epstein*)).  We affirm, in part, and reverse, in part.

### FACTUAL AND PROCEDURAL BACKGROUND

Adrian and Magdalena, in consultation with their respective counsel, stipulated to numerous facts in advance of trial including, without limitation, the duration of their marriage.  They married on February 18, 1995, and separated on November 27, 2008.  On April 8, 2009, Magdalena petitioned for dissolution of her marriage to Adrian.  A default judgment of marital dissolution was entered in the Tulare Superior Court on October 29, 2009.

The default judgment contained provisions for child custody and visitation; child support; division of the parties' assets, debts, and obligations; and equalizing payments.  No spousal support was ordered but the Tulare Superior Court reserved jurisdiction to make such an order in the future.

Among the assets addressed by the default judgment was real property located in Terra Bella, California (36 Acres), which was gifted to the parties by Adrian's parents in 2003 and 2004.  An appraisal for the 36 Acres was entered into evidence and indicated the actual size of the land is "32.78 assessed acres."  Although the parties and trial court have sometimes referred to the property as a 33-acre parcel, they have more frequently referred to it as the 36 Acres.  Accordingly, we adopt the latter terminology (i.e., 36

---

[1]It is common practice to use the parties' first names in family litigation "to both assist the reader and humanize a decision which seriously affects the litigants' lives." (*In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801, 803, fn. 2.)  We adhere to, but intend no disrespect by, this practice.

Acres) to refer to the land.  We note all the issues presented on appeal relate to the 36 Acres.

In that regard, the default judgment provided:

"The [36 Acres] … shall be sold and the net proceeds divided between the parties equally.  Alternatively, [Adrian] shall have the option of purchasing [Magdalena's] interest, upon price and terms as the parties mutually agree, said option to purchase to be exercised and completed within six (6) months from date of entry of Judgment herein." **2**

On or about February 9, 2010, Adrian and Magdalena stipulated to modify the default judgment.  In accordance with the parties' stipulation, the Tulare Superior Court entered an order to modify the default judgment (2010 Modification Order) which reads, in relevant part:  "Parties agree to amend the filed judgment of 10/29/09 as follows: Page 2.C #3:  Parties agree not to sell the [36 Acres].  The court reserves jurisdiction over this piece of property."

In 2010, the parties' attempted to reconcile.  Together, with their children, they moved to Bakersfield, California.  However, the reconciliation was unsuccessful.  According to Adrian, the parties abandoned their efforts at reconciliation after a year or so.  At trial, Magdalena contended "the parties separated for the final time in March 2012."  Thereafter, all proceedings related to the parties' divorce were held in the Kern Superior Court (trial court).

**The 36 Acres**

When the default judgment was entered, the 36 Acres were encumbered by a deed of trust dated May 10, 2007.  The deed of trust secured a business line of credit (LOC) in

---

**2**The default judgment also provided:  "[Adrian], shall assume, pay and hold [Magdalena] harmless from any and all obligations incurred by [Adrian] after date of separation or held in his `name alone.  [¶] … All property transferred hereunder is transferred subject to all existing encumbrances and liens thereon, if any.  The transferee of such property shall indemnify and hold harmless the other party from any claim or liability that the other party may suffer or may be required to pay on account of such encumbrance or lien."  Our decision in this matter does not rely on this provision of the default judgment.

the amount of $55,000. Although the deed of trust was signed by both Adrian and Magdalena, the LOC was in Adrian's name (and that of his sole proprietorship) only—i.e., "Adrian A. Cruz, a sole proprietorship DBA Adrian A. Cruz Transport." Adrian was the sole signatory on both the LOC-related agreements and the promissory note. The LOC agreement restricted Adrian's use of LOC proceeds, as follows: "Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing." Adrian's father, Victor Cruz, guaranteed Adrian's payment of the LOC indebtedness.

The LOC was scheduled to mature on May 10, 2010. On or about June 11, 2010, Adrian entered into a new loan agreement (New Loan) for a term loan in the amount of $55,000 to pay off the LOC. Similar to the LOC, the New Loan documents and related promissory note were in the name of "Adrian A. Cruz" only; Adrian's father guaranteed the New Loan; and use of the New Loan proceeds were restricted to "Borrower's business operations" unless otherwise allowed by the lender. The New Loan, like the prior LOC, was secured by a new deed of trust on the 36 Acres signed by both Adrian and Magdalena.

**Subsequent Proceedings Affecting the 36 Acres**

### The Parties' Pleadings and the Trial Court's Interim Ruling

On June 1, 2015, Magdalena filed a request for order (RFO) to modify the judgment. In it, Magdalena sought, among other things, an order to "enforce the sale of the [36 Acres], and the equalization payment, as ordered in the judgment."

On March 30, 2017, Adrian filed an RFO seeking, among other things, reimbursement of costs paid by him in connection with the 36 Acres after the parties' date of separation, and certain estimated costs to clean up the 36 Acres that had not yet been incurred or paid. Specifically, Adrian sought reimbursement for (1) payments made on the LOC and New Loan (LOC/New Loan Payments); (2) "payments made for waste

4.

discharge required by the Tule Basin Water Quality Coalition" (Waste Discharge Payments); (3) "payments made to the Terra Bella Irrigation District" (Irrigation Payments); (4) payment of property taxes on the 36 Acres (Property Tax Payments); (5) the cost of a 2015 appraisal for the 36 Acres (Appraisal Costs); and (6) clean-up costs for the 36 Acres (Clean-Up Costs) (collectively, Claimed Expenses). Adrian contended that, once all of the Claimed Expenses are deducted from the appraised value of the 36 Acres, a total of $152,754 in "potential net sale proceeds" would be available to be "divided evenly between [Adrian] and [Magdalena] or $76,377."

On April 28, 2017, the trial court issued an order setting a future evidentiary hearing on the issue of credits due to Adrian, if any. The court also ordered an interim payment of $75,000 to Magdalena for her "community interest" in the 36 Acres pending the hearing and without prejudice to the parties' competing claims concerning credits and "final buyout amount" for the 36 Acres.[3]

**The Parties' Stipulations**

In advance of the hearing on Adrian's RFO, the parties entered into two stipulations that were accepted and approved by the trial court.

By its terms, the purpose of the first stipulation (First Stipulated Order) was "(i) to set forth the factual issues on which the parties agree for the purpose of limiting the trial time needed in connection with any future hearings … and (ii) to define and narrow the issues in dispute." It further provided: "Except as otherwise indicated, pursuant to section 622 of the California Evidence Code, the facts set forth in this First Stipulated Order shall be conclusively presumed to be true and may be considered as evidence in this proceeding."

---

[3]Presumably, the interim payment of $75,000 was premised on Adrian's representation that if all Claimed Expenses are reimbursed to him, each party would likely receive $76,377 upon sale of the 36 Acres.

The second stipulation (Second Stipulated Order) set forth the procedural status of the case and noted the trial court had bifurcated the trial. In it, the parties agreed to the introduction of various exhibits which are discussed below, as necessary.

**Select Testimony**

### *Testimony Re Use of the 36 Acres*

Adrian testified as follows: He was in the trucking business and, as of the time of the first phase of trial, had owned a trucking company for "[w]ell over 20 years, about." He has three trucks—the same number he had at the time of separation—that are used to pick up trailers owned by others. His company operates on his parents' land situated across the street from the 36 Acres. His parents' land has a repair shop used in connection with Adrian's trucking business.

Adrian denied ever using the 36 Acres for purposes of running his company. He denied the 36 Acres were ever used for "farming or ranching purposes" while owned by his family or Adrian and Magdalena. When asked why it had not been so used, Adrian responded: "Couple of factors. The water issue is one of them. To establish an orchard, it would cost $100,000 as far as prepping the land, ripping, levelling it, irrigation lines, trees. We didn't have the means to establish one; it would be very expensive."

Adrian was asked: "Ignoring the mobile home, has [the 36 Acres] ever produced any income whatsoever?" Adrian responded, "No." He testified he never received income from the 36 Acres.

Magdalena's father, Zenon Rios Valle (Rios), was called to testify and contradicted much of Adrian's testimony concerning use of the 36 Acres. He testified he worked seasonally for Adrian for approximately 10 years, from 2003 up until the end of 2013. Before that, he worked for Adrian's father as a mechanic. He then began working as a driver for both Adrian and Adrian's father. During that time, Adrian had "about 20 to 25 trailers, but [Rios thought] they had more sets of trailers, a set is two trailers

6.

together." Rios testified trailers would be parked on the 36 Acres, he parked them there himself for "two or three years," and also retrieved trailers from the 36 Acres. He testified, "[W]henever something broke or when a truck turned over, the broken parts were taken [to the 36 Acres]," and, as recently as a year or less from the date of his testimony, he saw a trailer chassis on the 36 Acres as he drove by the property. He said parking the trailers on the 36 Acres was necessary because Adrian's parents' property had too many trees, parking was not always available, and maneuvering trailers was easier on the 36 Acres.

Adrian's brother-in-law and former business partner, Richard Lopez, was called to the stand. Lopez testified he was married to Adrian's sister but separated in 2013. Lopez worked for Adrian's father between 1991 and 1995. He went into partnership with Adrian and Adrian's father in or about late 2004. Their business (VCT) owned between 24 and 27 trailers. They were in business until approximately 2013, at which point they sold their trailers.

Lopez testified he was familiar with the 36 Acres. He confirmed VCT "on occasion" used the 36 Acres to park trailers due to limited space on Adrian's parents' property. When asked, "Would it be fair to [say] you parked trailers on the 36 acres during the year 2013 at least once a week?" Lopez replied, "You know, I can honestly say I never really paid attention to what was there, but I know there were trailers there. [¶] Whether they were ours from our business, or my father-in-law's [i.e., Adrian's father], or perhaps some equipment Adrian might have owned, there was equipment parked there. I can say that."

Turning his attention to 2013, Lopez was asked how often he would have occasion to drive by the 36 Acres. He testified, "Often I would go visit my in-laws every evening, most—probably four times, five times a week." He confirmed that, on those visits, there were always trucks or trailers on the 36 Acres. With regard to broken or damaged trailers, Lopez confirmed the 36 Acres was used as a staging area for both VCT and

7.

Adrian's father's business and that the repair shop mechanic would retrieve damaged trailers from the 36 Acres to bring into the shop for repairs. Adrian's father did not charge VCT for using the 36 Acres in this manner. Of the 36 Acres, Lopez estimated three-quarters of an acre was used to park trailers.

When asked whether he observed "garbage, tires, old equipment, or things that were stored" on the 36 Acres, Lopez responded, "In the years I worked for my father-in-law and years since, there were always trailers that belonged to my faither-in-law over there on that property. Just old equipment that was there." He recalled that "tires and old scrap metal and things like that" were kept on Adrian's parents' property across from the 36 Acres.

### *Testimony Re Use of the Proceeds of the LOC*

Adrian was asked about the proceeds of the LOC. Adrian claimed the majority of the proceeds "went to paying debts, credit, and living expenses because we were living well beyond our means at the time."

On cross-examination, Adrian admitted the LOC was in the name of his business, that he went to the bank without Magdalena to obtain the LOC, and he was truthful in telling the bank why he wanted the loan. He was asked the following questions and gave the following answers:

> "Q. Did you tell [the bank] you were going to use part of those loan proceeds for a photography business for [Magdalena]?
>
> "A. Like I said, I don't remember what I told them specifically.
>
> "Q. You don't recall? You don't recall whether you told them it was a split loan for two business[es] or just for your business?
>
> "A. It was for my family.
>
> "Q. It was for your family, all right. And that's what you told them, I need a business loan for my family? Is that what you told them?
>
> "A. To take care of my business and take care of my needs, yes.

"Q. But you told them the business was Adrian Cruz Trucking, correct?

"A. They put it under that name.[4]

"Q. All right. Do you believe they put something on the loan that you did not tell them? They put a different business than what you told them you wanted? Is that what you're telling me?

"A. No."

### Additional Testimony Re the 36 Acres

Adrian was also asked the following questions and gave the following responses:

"Q. Did you and [Magdalena], prior to the filing of this proceeding, ever discuss the possibility of dividing this property any other way than the net value after subtracting out the debt against the property?

"A. No.

"Q. Did you discuss the fact that even when you were buying her out, you were buying out for the net value on the difference between its fair market value and the property?"

"A. Yes.

"Q. Now, would it be fair to say that when you—now, after the default judgment was entered, the two of you entered into a subsequent order a few months later under which you agreed that you would not be required to sell the property at that point; do you recall that?

"A. Yes.

"Q. Why did you and she enter into that agreement?

"A. We entered into that agreement because I thought we were getting back together and have a family together; that's why we entered it.[5]

---

[4]The LOC loan agreement listed the name of Adrian's business as "Adrian A. Cruz Transport."

[5]On cross-examination, Adrian admitted he testified at deposition that he asked Magdalena not to sell the 36 Acres because he wanted to buy her out of the property.

"Q. The idea was you were saving the property in case you decided to build your dream house?

"A. Yes. [¶] …[¶]

"Q. Was there ever any discussion that, hey, look, if we do this later, I don't want any increase in the value of the land?

"A. No.

"Q. The understanding was always that whatever it sells for, it sells for? [¶] … [¶]

"Q. Is that correct?

"A. Yes."

**Accepted Offers of Proof as to Rebuttal Testimony**

Testimony in this matter was received by the trial court on March 22, 2018, and May 7, 2018. On December 11, 2018, counsel for each party made an offer of proof concerning their respective client's testimony on rebuttal. The parties and court accepted the offers of proof as to the substance of each party's rebuttal testimony but not as to the truth of the testimony, and no live testimony on rebuttal was received.

The following offer of proof was made on behalf of Magdalena: (1) "the 36 [A]cres, was used [by Adrian] regularly and habitually for the storage of trailers, as well as equipment being repaired and other items related to the business"; (2) "the trailers … stored there were not related to [Adrian's] father's business exclusively, but … was related to [Adrian's] business, including the Cruz trucking company, which is related to the loan that is held against the property"; (3) "it's not true that the property was only used by [Adrian's] father"; (4) "since the date of separation, [Magdalena] has had no control over it, has not had any use of it, received no rent, or payments of any kind or compensation for the use of that property"; (5) "the loan which is against the property was taken out for [Adrian's] trucking business, and … she received no portion of that money" for any use, "and … that money was controlled and used by [Adrian]

10.

exclusively"; (6) "[Adrian] told her that it was his business loan and his responsibility and that he would make the payments on that loan"; (7) Magdalena never received, or asked for in the past, "any of the bills that [Adrian] is claiming reimbursement for"; (8) Adrian "never offered to compensate [Magdalena] for use of the [36 Acres] such as one-half of rental value or anything of that nature"; (9) Magdalena took no tax deductions "for the loan payments or any other business expenses based on that property since the date of separation, and … [Adrian] has instead used the property as a business deduction on his taxes"; (10) "[Adrian] promised to make those loan payments and that it was his responsibility because it was related to his business"; and (11) "there was a mobile home" on the 36 Acres, "the mobile home was rented," rent payments "unknown to her" were made to Adrian's parents, and "it was an income-generating property during the time … they were married and then immediately thereafter."

The following offer of proof was made on behalf of Adrian: (1) Adrian would deny he made promises "to pay for this or that"; (2) the 36 Acres was owned by Adrian's parents "before it was gifted to the parties"; (3) "during the time [the 36 Acres] was owned by the parties, it was never farmed or rented to anyone," "during marriage it was never farmed or rented to anyone by them," and has not been farmed or rented to anyone since separation; (5) the 36 Acres "cannot be farmed … without spending large sums of money … to improve the property"; (6) Adrian believes the 36 Acres, in its current condition and as of the date of separation, could not be "rented to anyone for any price;" (7) the mobilehome on the 36 Acres "was rented to someone known to [Adrian's] parents" and the 36 Acres was given to Adrian and Magdalena "with the understanding that the parents would continue to rent the mobile home to that person and collect the rent on it"; (8) after the 36 Acres were gifted to Adrian and Magdalena, Adrian's parents continued to receive rent; (9) the "renter eventually stopped paying and moved from the property"; (10) after the renter moved from the property, the "mobile home was uninhabitable," and "the appraisal [of the 36 Acres] was based on the assumption the

11.

mobile home would have to be removed from the property and it would have to be cleaned up." Magdalena's counsel objected to the latter statement concerning the appraisal. Adrian's counsel agreed with the objection and stated "[t]he appraisal will speak for itself."

The offer of proof made on Adrian's behalf continued: (11) an estimated cost to clean up the 36 Acres was "a minimum of $26,000"; (12) "[t]o the extent the father's trucking company or [Adrian's] trucking company ever parked trailers or vehicles on the 36 [A]cres, or used [it] to turn their trucks around, the land … discussed during all of the testimony consisted of less than one acre on the corner of the 36 [A]cres"; (13) the area so used "is not paved, blacktopped or otherwise set up for the parking of vehicles, nor is it set up with any security arrangement to protect the vehicles like [his parents'] land"; (14) "no one ever suggested [Adrian's] father should be charged rent" for using the 36 Acres to turn trucks around or park trucks; (15) the area of the 36 Acres Magdalena claimed was "occasionally used to turn a truck around or to store trailers on had no alternative use."

**The Trial Court's Rulings and Subsequent Matters**

On April 29, 2019, the trial court issued its ruling on Adrian's claim for reimbursements of Claimed Expenses. On June 17, 2019, the trial court issued the subject order that adopted the language of the court's April 29, 2019, ruling.

In the subject order, the trial court found, among other things, no evidence of any prior agreements between the parties to the effect that Adrian would not be reimbursed for Claimed Expenses, no evidence Adrian intended the Claimed Expenses to be a gift to Magdalena, and no evidence Adrian's payment of Claimed Expenses was in the discharge of his duty to support Magdalena and their dependent children.

The trial court also found the testimony of Lopez and Rios to be credible. Their testimony largely established that Adrian, his father, and their separate and co-owned

12.

businesses, "routinely parked" their trailers on the 36 Acres and used the 36 Acres to store their old equipment. The court found Adrian "to have been extremely untruthful in his testimony," and wrote, "Other than matters [Adrian] conceded on cross-examination, the Court finds [Adrian's] testimony not credible." The court also found that "while [Adrian] may have 'only' used one acre out of the 36 available, he used as much of the 36 [A]cres as he and his father needed to run their businesses." Additional findings by the court will be discussed, as necessary, in the remainder of this opinion.

On July 5, 2019, Adrian filed a motion for new trial and statement of decision. A hearing on the motion was set for December 6, 2019. On October 1, 2019, Adrian timely appealed from the subject order.[6]

## DISCUSSION

### I.    Standard of Review

We review pure questions of law under a de novo standard of review. (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 445.) "As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact; 'the reviewing court should not substitute its judgment for … express or implied [factual] findings [that are] supported by substantial evidence.'" (*In re Charlisse C*. (2008) 45 Cal.4th 145, 159.)

"'[W]e "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor …." [Citation.] If the record demonstrates substantial evidence in support of the judgment, we must affirm even if there is substantial contrary evidence.'" (*In re*

---

[6]Because the notice of appeal was filed more than 60 days following notice of entry of the subject order, this court issued an order directing Adrian to file within 20 days of the date of the order "a letter brief setting forth a jurisdictional basis for the appeal" and indicated failure to file the letter brief would be considered abandonment of the appeal. When Adrian failed to timely file the letter brief, the appeal was dismissed. Adrian moved to vacate the order of dismissal and, for good cause shown, the order was vacated, and the appeal was reinstated.

*Marriage of Brooks* (2019) 33 Cal.App.5th 576, 589.)  "Substantial evidence is evidence that is reasonable, credible, and of solid value." (*People v. Buell* (2017) 16 Cal.App.5th 682, 687.)

The issues on appeal are whether the trial court erred in denying Adrian's request for *Epstein* credits (i.e., reimbursement for Claimed Expenses) and whether the court erred in offsetting credits by the value of [Adrian's] exclusive use of the 36 Acres (i.e., *Watts* charges under *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 374 (*Watts*)). A trial court's rulings on *Epstein* credits and *Watts* charges are reviewed for abuse of discretion. (*In re Marriage of Mohler* (2020) 47 Cal.App.5th 788, 797; *In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 318–319.)  "'[I]t is generally accepted that the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason ….'" (*Bustos v. Global P.E.T., Inc.* (2017) 19 Cal.App.5th 558, 563.)

## II.     The Trial Court Erred by Making Findings Contrary to Stipulated Facts

Adrian contends the trial court erred as a matter of law by finding the parties date of separation was November 2006 instead of November 27, 2008, as set forth in the First Stipulated Order.  Magdalena does not contest the proposition and referenced November 2008 as the parties' date of separation in a declaration in support of her June 1, 2015, RFO.  She does note, however, the court's decision "did not hinge on the 2006 date of separation."  We agree the court erred in finding a date of separation different from that stipulated to by the parties.  However, we conclude the error was not prejudicial.

"'A stipulation is an agreement between attorneys for adverse parties relating to a matter involved in a judicial proceeding.  It may relate to evidence or facts, and … it results in a judicial admission removing issues from the case.' [Citations.]  There is a salutary reason for supporting stipulations against ensuing attack in most instances: 'Stipulations … serve the convenience of the parties to litigation and often serve to simplify and expedite the proceeding [and] are supported by the policy of favoring

14.

compromise in order to reduce the volume of litigation.'" (*In re Marriage of Hahn* (1990) 224 Cal.App.3d 1236, 1239.)

"Generally, stipulations are binding upon the parties. 'Unless the trial court, in its discretion, permits a party to withdraw from a stipulation [citations], it is conclusive upon the parties, and the truth of the facts contained therein cannot be contradicted. [Citations.]' [Citation.] A stipulation is also binding on the court where the stipulation is not contrary to law, court rule or policy." (*Robinson v. Workers' Comp. Appeals Bd.* (1987) 194 Cal.App.3d 784, 790; accord, *In re Marriage of Oliverez, supra*, 33 Cal.App.5th at p. 302; Evid. Code, § 622 ["The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest; but this rule does not apply to the recital of a consideration"].)

The parties expressly stipulated, "the facts set forth in this First Stipulated Order shall be conclusively presumed to be true and may be considered as evidence in this proceeding." The next paragraph in the First Stipulated Order provides: "[Magdalena] and [Adrian] married on February 18, 1995, and separated on November 27, 2008, for a marriage of 13 years and 9 months." The court erred by deciding this factual issue contrary to the parties' stipulation.

However, "'it is not sufficient merely to show error, but it is necessary to further show that the error was sufficiently prejudicial to justify a reversal.'" (*Kyne v. Eustice* (1963) 215 Cal.App.2d 627, 635.) "[O]n appeal we review the decision of the trial court rather than its reasoning, and thus '… a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion.'" (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216.) As discussed below, the trial court had a sufficient evidentiary basis upon which to make its ruling even absent its erroneous finding as to the parties' date of separation.

15.

**III.  Whether Adrian Is Entitled to Reimbursement for Claimed Expenses**

**A.     The Purpose of the First Phase of Trial**

Trial in this matter was bifurcated.  The First Stipulated Order provided:  "Since the signing of the [LOC], various expenses [i.e., the Claimed Expenses] have been paid by [Adrian] related to the 36 Acres….  The exact amount of [the Claimed Expenses] is in dispute, and this issue does not need to be resolved and is not being resolved by this First Stipulated Order….  Once it is determined what portion, if any, of the [Claimed Expenses] should be charged to [Magdalena], the parties are hopeful that they will be able to agree that a separate trial on this issue will not be necessary."

The Second Stipulated Order provided, in part:  "As part of that First Stipulated Order, this court has set a bifurcated trial in this matter ….  The purpose of this bifurcated trial is to determine what items, if any, [Adrian] will be allowed to deduct from the value of the [36 Acres] to be divided as proper credits for [Claimed Expenses] which he has paid.  The trial will not decide the value of those credits.  At the conclusion of the trial, counsel will meet and confer on the value of any credits allowed and stipulate to any agreed totals.  Any disputed totals will then be subject to the second part of the trial, which shall then be set, to determine the dollar amount of any allowed credits."

Thus, the first phase of trial was limited to whether Adrian was entitled to *Epstein* credits for the various categories of Claimed Expenses without deciding the value of those credits.

**B.     *Epstein* Credits and *Watts* Charges**

"'[A]s a general rule, a spouse who, after separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be reimbursed therefor out of the community property upon dissolution.  However, there are a number of situations in which reimbursement is inappropriate, so reimbursement should not be ordered automatically.  [¶] Reimbursement should not be ordered if payment was made

16.

under circumstances in which it would have been unreasonable to expect reimbursement ....'" (*Epstein*, *supra*, 24 Cal.3d at p. 84.)

The *Epstein* court gave several examples of when reimbursement should not be ordered. They include "'where there was an agreement between the parties the payment would not be reimbursed,'" "'where the paying spouse truly intended the payment to constitute a gift,'" "'*where the payment was made on account of a debt for the acquisition or preservation of an asset the paying spouse was using and the amount paid was not substantially in excess of the value of the use*,'" or "'where the payment on account of a preexisting community obligation constituted in reality a discharge of the paying spouse's duty to support the other spouse or a dependent child of the parties.'" (*Epstein*, *supra*, 24 Cal.3d at pp. 84–85, italics added.)

A corollary to the rule set forth in *Epstein* was announced in *Watts*. The *Watts* court held a trial court has authority to order a spouse to reimburse the community estate when that spouse has had exclusive use of a community asset "between the date of separation and the date of trial." (*Watts*, *supra*, 171 Cal.App.3d at p. 374.)

## C. Adrian's Burden to Demonstrate Entitlement to *Epstein* Credits

Evidence Code section 500 provides: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) Adrian argues it was Magdalena's burden to demonstrate the use value of the 36 Acres and, having failed to do so, that value cannot be used to offset Adrian's claim for reimbursement of the Claimed Expenses.

Adrian's argument misses the mark. Although the parties agreed in the First Stipulated Order that the trial court would not decide the amount of any reimbursements ordered by the court, it was still Adrian's initial burden to demonstrate he was *entitled* to reimbursement. (Evid. Code, § 500; *In re Marriage of Braud* (1996) 45 Cal.App.4th 797,

17.

822–823.)  We also note the first phase of trial was not established for the purpose of determining *Watts* charges.  Accordingly, we do not view that avenue of inquiry foreclosed by the subject order.  Because the First Stipulated Order barred the court from determining the amount of any reimbursements (i.e., *Epstein* credits) due to Adrian, it would be manifestly unfair to require Magdalena to introduce evidence *in the first phase of trial* in an effort to prove whether the use value was sufficient to offset such *Epstein* credits.

Below, we examine the categories of Claimed Expenses and the evidence relevant to Adrian's claim for reimbursement.

### D.    The LOC/New Loan Payments

#### 1.    *The Trial Court Did Not Violate Code of Civil Procedure Section 580*

Adrian contends the trial court erred in finding the LOC "was Adrian's separate property obligation."  He contends Magdalena "acknowledged that the 36 Acres was community property and that it was subject to a secured loan that had been incurred during marriage and was presumptively community property….  As part of her proposed division of community property, [Magdalena] asked that the 36 Acres be sold and that the net proceeds (after paying off the secured loan) be divided equally between her and Adrian….  The [Tulare Superior Court] judge who signed the Default Judgment had no jurisdiction to do anything other than grant Magdalena the relief set forth in her Request for Default."  As a result, Adrian argues the Tulare Superior Court judge "could not have assigned the [LOC] that secured the 36 Acres to Adrian as his separate property.  Any such order would have been void."

In support of his contention, Adrian cites to subdivision (a) of section 580 of the Code of Civil Procedure, which provides, in relevant part:  "The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint …."  He contends the trial court interpreted the default judgment in a manner that gave Magdalena

18.

greater relief than she requested in her divorce petition, and argues, "a judge interpreting the default judgment cannot interpret it in a manner that grants the person who requested the default more relief than … she requested."

Adrian's argument fails to consider that, when Adrian sought relief from the default and default judgment, the parties reached an agreement to modify the judgment as it pertained to the 36 Acres. The 2010 Modification Order provides, "Parties agree to amend the filed judgment of 10/29/09 as follows: Page 2.C # 3: Parties agree not to sell the 36 acres …. The court reserves jurisdiction over this piece of property." This modification had the effect of removing from the default judgment the provision which provided the 36 Acres "shall be sold and the net proceeds divided between the parties equally." Consequently, the trial court did not violate Code of Civil Procedure section 580 by issuing the subject order.[7]

### 2. The Court's Allocation of the LOC Debt to Adrian Was Within the Court's Discretion and Is Supported by Substantial Evidence

Adrian contends both the trial court and Magdalena "appear to agree that Adrian has a presumptive right to be reimbursed for his [Claimed Expenses]." Adrian does not adequately explain the basis for this contention and does not cite to anywhere in the record from which we can draw this conclusion. Nothing in the record supports this contention. In fact, the purpose of the first phase of trial, as explained in the Second Stipulated Order, was "to determine what items, *if any*, [Adrian] will be allowed to

---

[7]The First Stipulated Order provides that Adrian and Magdalena "agreed (and [the trial] court ordered) that, *consistent with the terms of the Default Judgment*, the 36 Acres either should be sold or [Adrian] should purchase [Magdalena's] one-half interest in the property" (italics added). We do not interpret this statement as an attempt, or agreement, to reinstate the default judgment, and the trial court was not required to so interpret the statement. The trial court could infer this was merely an acknowledgment the original default judgment provided for the sale of the 36 Acres to Adrian or a third party, and that, contrary to the 2010 Modification Order, the parties now agreed such a sale should occur.

19.

deduct from the value of the [36 Acres] as proper credits for expenses which he has paid" (italics added).

Family Code section 2625 provides: "Notwithstanding Sections 2620 to 2624, inclusive, all separate debts, including those debts incurred by a spouse during marriage and before the date of separation that were not incurred for the benefit of the community, shall be confirmed without offset to the spouse who incurred the debt." "The court has jurisdiction to order reimbursement in cases it deems appropriate for debts paid after separation but before trial." (*Id.*, at § 2626.) By giving a trial court authority to order reimbursement where "it deems appropriate," the Legislature has authorized the trial court to exercise its discretion in deciding such matters.

Although the trial court erroneously determined the parties' date of separation was November 2006, Magdalena is correct in arguing the subject order "did not hinge on the 2006 date of separation." Specifically, the trial court also found "the [LOC] was obtained 'solely for [Adrian's] business operations' 'to support [Adrian's] business activities'; that Adrian "was the only signatory on the [LOC]"; the LOC was guaranteed by Adrian's father; and Magdalena "did not benefit from [the LOC] or its subsequent conversion to [the New Loan]." Substantial evidence supports these findings.

The LOC loan documents were signed only by Adrian. Those documents list Adrian and his sole proprietorship as the only debtors on the LOC. In the offer of proof accepted by Adrian's attorney, Magdalena's testimony was that she received none of the LOC money, that it was used and controlled by Adrian exclusively, and that she never received any tax benefit from the money. Such testimony supports an inference that Magdalena and the community estate never benefitted from the LOC. Moreover, the proffered testimony, if credited by the trial court, established that Adrian admitted and acknowledged his sole responsibility for the LOC since it was related to his business.

Although Adrian contended the LOC proceeds "went to paying debts, credit, and living expenses because we were living well beyond our means at the time," the trial

20.

court found such statements self-serving and not credible. Moreover, to credit such testimony would be to countenance a fraud on the LOC lender, which limited use of the funds to Adrian's "business operations, unless specifically consented to the contrary by Lender in writing." There is no evidence in the record the lender permitted alternative uses of the LOC proceeds.

The trial court's determination that Magdalena (and, consequently, the community estate) did not benefit from the LOC is supported by substantial evidence. The trial court's decision to deny Adrian's claim for reimbursement of LOC/New Loan Payments was within the bounds of reason and was not an abuse of discretion.

### E. Waste Discharge Payments, Irrigation Payments, and Property Tax Payments

With regard to the Waste Discharge Payments, Irrigation Payments, and Property Tax Payments, the trial court expressly found "[Adrian] incurred these expenses for the preservation of the 36 acre lot and the amounts paid were not substantially in excess of the value of his use of the 36 acres." We are bound by the trial court's findings of fact if supported by substantial evidence. (*Dwight v. Leonard* (1959) 174 Cal.App.2d 199, 202.)

We conclude the trial court's statement that the aforementioned payments were incurred for the preservation of the 36 Acres is supported by substantial evidence only as to the Property Tax Payments and Waste Discharge Payments. However, we conclude Adrian is not entitled to *Epstein* credits for the Irrigation Payments for reasons different from those stated by the court.

As to the finding that the amounts paid for these various categories of expenditures were not substantially in excess of the value of Adrian's use of the 36 acres, the finding is supported by substantial evidence only as to the Waste Discharge Payments. But once again, for reasons different from those stated by the trial court, we conclude Adrian is not entitled to *Epstein* credits for the Waste Discharge Payments.

21.

Finally, with respect to Property Tax Payments, contrary to the trial court's determination, we conclude Adrian is entitled to *Epstein* credits.

We discuss these determinations in further detail below.

### 1.    *Property Tax Payments*

Substantial evidence supports the finding that Property Tax Payments benefitted the 36 Acres. A property may be encumbered by tax liens and ultimately may be lost due to a failure to pay real property taxes. (*McMaster v. City of Santa Rosa* (1972) 27 Cal.App.3d 598, 601–602.) Thus, it was necessary to pay the real property taxes assessed against the 36 Acres to avoid such adverse consequences.

We question whether Adrian would be entitled to *Epstein* credits for *all* such Property Tax Payments. For reasons not disclosed by the record, there were numerous penalties assessed against the property. However, we are mindful of the fact the trial court was not determining the *amount* of *Epstein* credits to which Adrian was entitled. "Family law courts are courts of equity." (*In re Marriage of Mohler*, *supra*, 47 Cal.App.5th at p. 796.) We presume, therefore, if the parties are unable to reach an agreement on the amount of *Epstein* credits due Adrian for Property Tax Payments made by him, the court will evaluate the propriety of awarding Adrian *Epstein* credits for payments made toward tax penalties in the second phase of trial.

### 2.    *Irrigation Payments*

The documentary evidence concerning Irrigation Payments includes two customer transaction summaries from the Terra Bella Irrigation District (TBID) for Irrigation Payments made in connection with the 36 Acres. The first summary, for the period November 30, 2009, through June 29, 2010, is for an account in the name of Victor Cruz. The second summary, for the period June 29, 2010, through July 26, 2017, is for a different account in the name of "Adrian Cruz #1." Also included is an unpaid bill for Irrigation Payments dated November 26, 2015.

The First Stipulated Order contains the following statement concerning the Irrigation Payments: "Since the signing of the [LOC], various expenses have been paid by [Adrian] related to the 36 Acres. Basically, these expenses consisted of … the required payments to the [TBID] after the Default Judgment was entered." No further information concerning the Irrigation Payments is contained in the First Stipulated Order. The Second Stipulated Order merely provides for the admission of the TBID customer transaction summaries and the unpaid bill into evidence. No further information concerning the Irrigation Payments is contained in the Second Stipulated Order. No testimony was provided concerning the Irrigation Payments, the TBID, or the necessity of incurring debt to the TBID for irrigation.[8]

To the extent the land has been irrigated or otherwise used TBID water after the parties' date of separation, the evidence does not support a finding that Magdalena (or the community estate) will benefit from the use of TBID water.

On this record, we conclude substantial evidence does not support the trial court's determination that the Irrigation Payments were incurred for the *preservation* of the 36 Acres. It was Adrian's burden to demonstrate the right to *Epstein* credits in connection with this expense. (Evid. Code, § 500; *In re Marriage of Braud*, *supra*, 45 Cal.App.4th at pp. 822–823.) He did not meet that burden.

Although the trial court gave a different reason for denying Adrian's claim for reimbursement of Irrigation Payments, we conclude the court reached the right result.

_____

[8]We also note the appraisal that was introduced into evidence, and relied on by Adrian for a portion of his claim for reimbursement of Claimed Expenses, provides, in part: "The [36 Acres] is not leased. There is a lease market for dry land farming. These leases are typically for one crop season with the lessor receiving 15–25% of the crop or net income. With the current lack of district water deliveries, the [36 Acres] would not be leased for irrigated farming." It also provides, in part, "The Sales Comparison Approach is considered to be an applicable approach to value the [36 Acres]. In the case of the [36 Acres], the location, water availability, and soils type are the determining factors." The appraisal value of the 36 Acres was based on the Sales Comparison Approach and appears to indicate the value of the 36 Acres is negatively affected by the lack of TBID water.

Consequently, we affirm the court's determination regarding Irrigation Payments. (See *Schabarum v. California Legislature*, *supra*, 60 Cal.App.4th at p. 1216.)

### 3. *Waste Discharge Payments*

The documentary evidence submitted in support of Adrian's claim for reimbursement of Waste Discharge Payments included (1) a final notice from the Central Valley Regional Water Quality Control Board (Water Board). The notice states, in part, "On 19 September 2013, the [Water Board] approved the Waste Discharge Requirements General Order … for Growers within the Tulare Lake Basin Area that are Members of a Third-Party Group. All commercial irrigated lands within the Tulare Lake Basin Area are now required to get regulatory coverage through one of the options described below," and (2) a 2014 application for new membership within the Tule Basin Water Quality Coalition (TBWQC), indicating a charge of $100 for the application.

As with the Irrigation Payments, no substantive information (aside from that contained in the aforementioned notice and application) is contained in the record. It appears, however, membership in the TBWQC is a reasonably necessary expense. Given the de minimis amount of the cost of the application, we cannot say the trial court erred in finding that the use value of the 36 Acres offset the cost of the application. We will uphold the trial court's decision with regard to Waste Discharge Payments.

### F. Clean-Up Costs

With regard to Clean-Up Costs, the subject order provides: "The 36 [A]cres was appraised 'under the Hypothetical Condition that the farmstead area has been cleaned up and the property is ready for development to permanent buildings. The farmstead includes abandoned tires and equipment. The hypothetical buyer would require the seller to remove these items or discount the purchase price for clean-up ….' [Citation.] [Adrian] provided one estimate for the clean up costs and seeks 'reimbursement' for one-half the costs. [Citation.] [Adrian] has not actually incurred any of [the] out-of-pocket

24.

expenses set forth in the estimate. Moreover, there is no evidence that he will in fact incur said expense. The [trial court] therefore denies his request to be reimbursed for the estimated [C]lean[-U]p [C]osts."

Our review of the record reveals the trial court was correct in its assessment that Adrian failed to produce evidence to demonstrate he actually incurred Clean-Up Costs or that he will, in fact, incur those costs.

We also note the record is unclear as to the basis of the agreement (assuming there is one) for the sale of Magdalena's interest in the 36 Acres. For example, the evidence does not actually disclose the parties *agreed* to a $280,000 valuation—although one might be inclined to presume such an agreement based on the parties' briefing. In addition, the record does not disclose the parties' *agreed* that any agreed-upon purchase price would be reduced by the cost of removing tires and equipment from the property. The fact that the parties agreed to have this latter issue adjudicated by the trial court suggests no agreement on the issue was ever reached.

The First Stipulated Order merely states, "[Adrian and Magdalena] eventually agreed (and [the trial] court ordered) that, consistent with the terms of the Default Judgment, the 36 Acres either should be sold or [Adrian] should purchase [Magdalena's] one-half interest in the property. For the purpose of resolving this issue, the 36 Acres was appraised by Ronin Consulting, Inc. A copy of the appraisal … valued the 36 Acres at $280,000 …. Based on the Appraisal, [Adrian] purchased [Magdalena's] one-half of the parties' community property interest in the 36 Acres on May 10, 2017, subject to this motion for credits, and with title not changing until the credits issue was resolved by the court." Neither this stipulation, nor the evidence introduced at trial, supports an inference there was an agreement to offset any sale price by the Clean-Up Costs.

Code of Civil Procedure section 909 empowers this court to make factual findings in bench trials based on evidence introduced at trial so long as we give deference to the trial court's findings that are supported by substantial evidence. (Code Civ. Proc., § 909;

25.

*People v. Werner* (1960) 184 Cal.App.2d 441, 443–444 [decided under former § 956a of Code Civ. Proc., predecessor statute to § 909 of Code Civ. Proc.].)  It may be inferred that the tires and abandoned equipment located on the 36 Acres are the property of Adrian's business.  Adrian's business, his father's business, and VCT all used the 36 Acres for business purposes, including storage.  We find the tires, old equipment, and other items located on the 36 Acres are a byproduct of Adrian's business and his family's and partnership's coordinated business operations.  The Clean-Up Costs are properly charged to Adrian's business and do not support an award of *Epstein* credits.[9]

We will affirm the subject order as it pertains to the Clean-Up Costs.

## DISPOSITION

The subject order with respect to its determination that Adrian is not entitled to *Epstein* credits for Property Tax Payments made after the parties' date of separation, is reversed.  The Property Tax Payments were necessary to preserve the 36 Acres.  In all other respects, the subject order is affirmed.  In the interest of justice, each party shall bear their own costs on appeal.

PEÑA, Acting P. J.

WE CONCUR:

MEEHAN, J.

DE SANTOS, J.

---

[9]We note the estimate for Clean-Up Costs also includes removal of the mobilehome on the 36 Acres.  However, the hypothetical condition in the appraisal that called for removal of abandoned tires and equipment did not call for removal of the mobilehome.

26.